## BRANCH vs. MITCHELL.

When any of the defendants in a chancery suit are minors, the court is the guardian of their rights, and must give them here as well as below, the benefit of every ground of defence of which they might have availed themselves by demurrer or by general and particular denial of the allegations of the bill.

Nor would they, not demurring, nor even if the objection were not made at the hearing, lose the benefit of an objection to the jurisdiction of the court that would have been valid on demurer.

Where a party has the only or better *legal* title to land, he may obtain or regain possession by an action of ejectment if he is out of possession; and it is reasonable that equity should decline to interfere where he may obtain all the relief he needs at law. (*Apperson vs. Ford*, 23 *Ark.*, 746.)

If he be *in* possession, then, as he can bring no action at law, it has been held that he may ask a court of equity to remove a cloud upon his title which makes it less valuable, or may prevent his disposing of it to others.

But where one holding an equitable title only to lands, or a junior legal title with prior or superior equities, comes into a court of equity to impeach or cancel, or compel a conveyance of, the senior or better *legal* title, the jurisdiction of the court in no wise depends on the question of possession.

And in each case the court of chancery will have jurisdiction though no fraud is charged in the bill.

Depositions read before the register and receiver of the United States land office could not be read in this suit in chancery, unless it were shown that the witnesses were dead or beyond the reach of the process of the court.

A person conveying lands by a deed containing the words "grant, bargain, sell and convey," is not a competent witness for his grantee in a suit between such grantee and a third person concerning the title to the lands.

When on an appeal from a decree in chancery the question presented to this court is one simply of fact, it is precisely as it would be if the parties had had it tried before a jury on an issue out of chancery, and the verdict being against the appellants, their motion for a new trial had been overruled.

Even if we thought the weight of the testimony was against the finding, we should not disturb it, unless it was palpably and glaringly wrong.

If there is merely a doubt, or a preponderance of testimony one way or the other, the finding below must remain conclusive.

By the words of the act of congress of September 28, 1850, all the lands in the state which were swamp and overflowed, and thereby unfit for cultivation, immediately passed to and vested in the state.

The provisions of the 5th section of the act of January 11, 1857, must be construed to be a consent on the part of the state to receive from the United States the purchase money paid to the latter for only such of the swamp lands as the state could rightfully relinquish; and not for any which any person might obtain a right to as against the state before the purchase of the same by another from the United States.

Under the act of January 11, 1851, a levee contractor had a preference right of entry to lands in the rear and adjacent to his front lands; and he might make his selections before he had completed his levees.

The law of January 6, 1851, did not say that he should not select his land until after he had finished his work; but only that when he had done both he should furnish the numbers of the land to the commissioners, and receive from them a certificate.

When he had finished the work, if he had selected the lands and furnished the numbers to the commissioner, his right to the land was complete, whether he ever obtained a certificate or not.

No matter at what date he selected the lands; if he finished the work, in whole or in part, and the commissioner approved and received it, and the amount due for it was enough to pay for the lands, they became his, and his title, if necessary, as against any intervening purchaser or claimant, would relate to the 11th of January, 1851, on which day the right of preference in building the levees and taking these lands in payment vested.

His right of pre-emption was to all the lands in rear of and adjacent to the front land by right lines.

The selection in this case was made by a letter addressed to the commissioner, which was sufficient.

And the entries in the book kept by the commissioner, whether it was a *record* or not, are sufficient to prove the selections and applications noted in it, where the commissioner has sworn that he entered them correctly there.

When he filed it in the office of the board, it became sufficient evidence to the board on which to base its confirmations.

The entry of the appellee having been confirmed by the commissioners, their decision is conclusive unless properly impeached.

The law presumes in favor of the commissioners that they acted on sufficient data and evidence.

The commissioners had power to pay for the work as it advanced towards completion.

The appellee had a pre-emption right and was only bound to pay for the land in one way, by doing the work undertaken by him to a sufficient amount, by a certain time and in accordance with his contract.

Whether he made known his selection of the lands sooner or later, so that he did not permit his right to lapse by abandonment, made no difference. It was only material that he should do it when or before his work was finished and received.

*Appeal from Arkansas Circuit Court in Chancery.*

Hon JOHN C. MURRAY, Circuit Judge.

GARLAND for the appellant.

WILLIAMS and STILLWELL for the appellee

*Opinion prepared by* A. PIKE, Esq.—See *note* page VIII.

Samuel Mitchell instituted suit in chancery against John A. Jordan, Joseph Branch, and the minor heirs of George W. Martin, to obtain cancellation of the patent granted to Jordan by the United States for certain lands in Arkansas county, and to have his own title to the same perfected and quieted. Jordan disclaimed title and interest. Branch answered, and general defence was interposed for the minor heirs by a guardian *ad litem* appointed by the court. Replications were filed to each answer, and the cause heard on the pleadings, exhibits, other documentary evidence and depositions.

The case as presented to us for decision is as follows:

Before the passage of the act of congress of 28th September,

29

1850, granting to the state of Arkansas the whole of the swamp and overflowed lands in the state, "made unfit thereby for cultivation," Mitchell had purchased and owned lands on the Arkansas river, in the alluvial bottom, on and along the river bank; in rear of, and adjacent to which lay the lands in controversy, also in the alluvial bottom, and lower than the front lands. On the lands owned by him were his plantation and homestead. It is very clear from the testimony that the back lands were swamp and overflowed lands, unfit for cultivation in their natural state and without protection from levees, and that therefore they passed to the state under the grant.

On the 6th of January, 1851, the legislature of the state provided for reclaiming these swamp and overflowed lands, by providing for the creation of a board of three commissioners, empowered to fix the price of the lands, to inaugurate a system of levees and drains, to let out the making of the same to contractors, and to make payment to such contractors; and on the 11th of January, 1851, by a supplemental act, it was, among other things, enacted, that any person owning lands on the banks of any river, in any land district, should have the preference of taking the contract to levee such lands; and also the preference " to take in payment for executing his contract, any swamp or overflowed lands lying in the rear, adjacent to his own lands."

By the principal act, payment for making levees and drains was to be made "in the lands reclaimed or in the proceeds of the sales thereof" at the prices to be previously fixed by the commissioners; the commissioners were empowered "to issue land scrip representing quarter section tracts," in which, "at his option, and in lieu of lands," any contractor might demand and receive payment for his work; and it was provided, that when any contractor should have finished his work in accordance with his contract, and should "have selected his land in payment therefor, or located his scrip in lieu thereof," he should furnish the numbers of the land to the commissioners, and on their

certificate the governor should execute a deed to him or his assignee.

On the 3d of June, 1851, the board of commissioners, by ordinance, empowered each commissioner, within his division or district, to locate the necessary levees, let the contracts for building them, and supervise and pass upon the work. On the 2d of September, they required contractors, claiming adjacent lands by preference right, to take them immediately in rear of their work, by right lines; and provided that "no portion of land" should be sold for cash, at the fixed rates, except to contractors, in payment for work, or to pay expenses. On the 14th of October, they fixed the price of lands within six miles of a navigable stream at 75 cents per acre; and established three offices, for sale of lands, one in each division, subject to the supervision of the commissioner assigned to the division. A sub-commissioner was provided for, for each division, and certificates of purchase were to be signed by the commissioner of the division, and countersigned by the sub-commissioner. These were to "entitle the purchaser to the land" so purchased. On the 8th of January, 1852, the board ordained that contractors might receive pay whenever they had completed 5,000 cubic yards of levee, in accordance with their contract, or as soon afterwards as the same could be measured, received and approved of; provided that the work were fully secured, and approved of by the commissioner of the division. And, on the 9th of January, 1852, the board ordained that the secretary of the board, or the commissioner of the division should issue certificates to persons applying for lands and filing scrip for the same, or an authenticated account of work done. On presentation of these certificates to the board, and if the lands were confirmed to the state, the purchaser was to receive a full certificate of purchase for the lands.

Creed Taylor, one of the commissioners in 1851, was assigned to the district or division in which the lands in controversy lay.

On the 16th of July, 1851, Mitchell took, and entered into

a contract for the leveeing of the lands in front of those in controversy, by the terms of which he was to be paid fifteen cents a cubic foot for the contents of the levees "when completed and received."

On the 12th of November, 1851, Mitchell wrote to Taylor, the division commissioner, requesting him to enter and secure for him, among other lands, all those in controversy, that is, lots 9, 10 and 11, in the south-west quarter of section 31, in township 8 south, of range 3 west; and the north half and south-west quarter of section 5, and the whole of fractional section 6, in township 9 south, of range 3 west.

On the 20th of November, Taylor entered these, as applied for by Mitchell, "for work not yet received," in his memorandum book of sales and entries, which was afterwards filed and remained in the office of the board.

The bill alleges that, on the 15th of December, 1851, Taylor gave' Mitchell a certificate of entry of these and other lands, which is lost; and an affidavit of its loss was filed by Mitchell before the hearing; but no evidence was made of the existence or contents of such certificate.

The bill also alleges that the entries were confirmed by the board in January, 1851. Taylor testifies that they were to be confirmed on the 6th of January. The records of the swamp land commissioners show that Mitchell applied to enter them on the 8th of February, 1852.

By section 31 of the act of 12th January, 1853, the commissioners were required to file in the auditor's office a list of all swamp and overflowed lands disposed of by them, showing to whom, for what and when each tract of land was sold, to what class each tract belonged, the name of the person who signed the certificate of purchase, the number of the certificate, etc., and the records in the auditor's office show that the lands in question were entered by Mitchell on the 8th of February, 1852. On the 3d of April, 1855, Hobbs and Williams, swamp land commissioners, certified that it appeared from evidence in the office

of the board, that they were sold to Mitchell on the 20th of November, 1851. They were, no doubt, governed by the entry in Taylor's book of memoranda.

We do not think there is any material discrepancy, in these dates. It is quite clear, we think, that on the 12th of November, 1851, Mitchell wrote to Taylor, selecting these and other lands, in which he desired to receive payment for his work: that Taylor received the letter about the 20th, and on that day made the entry: that he is mistaken in testifying that the entries were confirmed on the 6th of January, but they were in fact confirmed on the 8th of February, 1852, at the session of the board which commenced in January.

On the 18th of December, 1851, Taylor reported these and other lands to the governor, as swamp and overflowed, and unfit thereby for cultivation. The governor applied to the surveyor general to report the same as swamp and overflowed lands, and on the 20th of December, that officer approved the list, and recognized the lands as of the character intended by the grant.

In the meantime, on the 25th of November, 1851, John A. Jordan entered the lands in controversy, among others, in the proper land office of the United States, with Choctaw scrip, and afterwards, obtained patents for the same. Before the patents issued, he conveyed one undivided half of the lands to Branch by a deed whereby he "granted, bargained, sold and conveyed" to him; warranting against the lawful claims of all persons claiming through or under himself, but against none other. The other half he seems to have treated as the property of his partner, George W. Martin; but never conveyed it to him.

Soon after Jordan's entry, Mitchell protested against it, and it was suspended. The commissioner of the general land office then directed the register and receiver at Little Rock to give notice to the parties and take proof as to the character of the land, and certify the same, with their joint opinion, to the surveyor general.

On the 4th of December, 1854, the parties appeared before the register and receiver: witnesses were examined, and those officers

certified it to the surveyor general, to be their opinion that the lands were swamp and overflowed within the meaning of the act of congress; and the surveyor general also so certified, to the commissioner of the general land office on the 19th of December.

The first allowance for work was made to Mitchell, on the 7th of April, 1852. Many others were made on different days afterwards, during the same year. He had already been charged with the price of the lands applied for by him; and as each allowance was made, he was credited with its amount, against the previous charges.

The act of 20th January, 1855, recognized the validity of certificates of purchase given by the swamp land commissioners, or any one of them, or by any one acting under their authority, and provided the means of obtaining patent certificates thereon. And the act of 7th January, 1857, authorized the auditor to issue duplicate certificates of entries made by persons under any of the acts for the entry and sale of the swamp and overflowed lands, in lieu of certificates lost, when it shall appear, by the public records in the auditor's office, or in that of the land agent, that such entry in fact existed.

The heirs of Martin being minors, the court is the custodian of their rights, and must give them, here, as well as below, the benefit of every ground of defence of which they might have availed themselves by demurrer or general and particular denial of the allegations of the bill. Nor would they, not demurring, nor even if the objection were not made at the hearing, lose the benefit of an objection to the jurisdiction of the court, that would have been valid on demurrer.

We have, therefore, in consequence of the expression of individual opinion on the part of the learned judge who delivered the opinion of the court in the case of *Apperson vs. Ford*, 23 *Ark.*, 746, looked at the question of jurisdiction, as dependent on the possession or non-possession by the plaintiff, of the land in controversy. For it is undeniable that the bill does not allege that

the complainant has possession of the lands, as to which he invokes the aid of the court in this case.

When a party has the only or the better *legal* title to land, as against that which he wishes to put at rest, he may obtain or regain possession by an action of ejectment, if he is out of possession; and it is reasonable that equity should decline to interfere where he may obtain all the relief he needs, at law. If he is *in* possession, then, as he can bring no action at law, it has been held that he may ask the court of equity to remove a cloud upon his title, which makes it less valuable, or may prevent his disposing of it to others. The court of chancery will not become a tribunal to try the legal title to land; or, in other words, it will not without some special ground for assuming the jurisdiction, undertake on behalf of the *better* legal title, to remove out of its way an inferior title, legal or equitable. But whether one holding a junior or inferior legal title, with prior or superior equities be in or out of possession, it is difficult to conceive on what ground his right to the aid of a court of equity can be denied. If *in* possession, he may be ousted by an ejectment: if *out*, he cannot obtain possession, when confronted by the only or the older and better legal title. If *in* possession, he cannot *bring* ejectment; *out*, he can not maintain it.

The language of the courts is always to be understood by applying it to the facts of the case decided. That which seems to be general and of universal application, has, in reality, often a limited application; and so the words of truth and the utterances of the law, undeniable in the case wherein they are spoken, become the parents of error and false doctrine. That judges have often been too incautious in their language, is true: and so it has been in regard to this particular doctrine.

Where one holding an equitable title only to lands, or a junior legal title with prior or superior equities, comes into a court of equity to impeach and cancel, or compel a conveyance of, the senior or better *legal* title, the jurisdiction of the court in no wise depends on the question of possession. He does not

come to have "a cloud upon his title" removed. In this case, the best legal title, even if Mitchell held a patent from the state, would be in Branch; and Mitchell has a clear right to invoke the aid of the court.

It is also objected that the bill is deficient "in not charging fraud and mistake, especially, in allowing Jordan to make his entry." But, in a case like the present, though fraudulent courses on the part of the holder of the better or only legal title, would add strength to the contestant's case, if the fraud existed, his case may well be complete in the absence of any actual fraud; and if the title impeached had been obtained in entire ignorance, on the part of the holder of it, of any title, or claim or equity whatever on the part of the contestant, the equities of the latter might still be perfect, vested under the law, and his right to relief and redress complete. When, in the case of *Cunningham vs. Ashley & Beebe*, 15 *Howard*,      ; 13 *Ark.*, 653, the complainant showed that he had a valid pre-emption, which, but for the legal title procured by the defendant, ought by law to have ripened into a legal title, it was entirely unimportant whether their entry of the lands was procured or accompanied by actual fraud. And as to mistake, if the entry by Jordan was permitted when the United States no longer owned the land, of course Jordan was at least mistaken in purchasing and paying for it, and the land officers in selling it, and the general land office and president, in treating the sale as valid, and granting a patent.

That the issuance of the patent is an act of sovereignty, if it were so, could not make an allegation of fraud or mistake in procuring it, any the more necessary. True, it is not to be "lightly questioned, or set aside on slight provocations." But the United States, in selling their lands, exercised none of the attributes of sovereignty. They were simply the owners in fee simple absolute of the public lands: and as between persons claiming title under different grants or conveyances from them, their deeds (and a patent is but a deed) stand upon the same footing, in a court of equity, as the deeds executed by an individual owning lands in

fee simple. The grant of swamp and overflowed lands to the state was as much an act of sovereignty; and the question in the case is, at bottom, whether these lands were disposed of and possessed by one or the other conveyance from the same grantor. Whether Jordan did or did not intend a fraud is not a question that can affect the rights of Mitchell. If he cannot make out his case without alleging such fraud, he cannot make it out at all.

There is no doubt that, in order to demand an inquiry into the validity of Jordan's entry, Mitchell must show that if no one had interfered as Jordon has done, the state would have had the power to dispose of the land to himself; and that he has so dealt in regard to it, that, the title of the state becoming complete, he would be entitled to demand from her a conveyance, or could procure title under her by proper suit. The court would not at the instance of a party not interested and not entitled to a conveyance from the state, undertake to inquire whether the lands passed to the state or not, under the act of congress granting the swamp and overflowed lands. If the lands in controversy have not, in equity, passed from the state to Mitchell, the state alone is competent to impeach the title of Jordan or Branch; and this especially, since the act of congress of the 2d of March, 1855, authorized patents to issue to persons who had entered or purchased swamp lands, prior to the issue of patents to the state; and since the state itself, by the act of 11th January, 1851, consented to receive from the United States the purchase money paid for any swamp lands, theretofore or thereafter sold by the United States.

The first enquiry, therefore, in this case, is whether these lands passed to and vested in the state, as by a grant *in presenti*, by the provisions of the act of congress of September 28th, 1850; and the second, whether, under the laws of the state, Mitchell, if the state had the power, or now has the power, to convey to him the lands, is entitled to demand a conveyance.

The first question requires it first to be determined whether the lands were, at the date of the act of congress, swamp and over-

flowed, and thereby rendered unfit for cultivation. It is upon this question the testimony taken before the register and receiver bears, and it is denied that it was competent to read that testimony at the hearing. Two of the witnesses, *Shultz* and *Smith*, had died before this suit was brought. The testimony, laying their's aside, is ample and uncontradicted in regard to the character of the land; it being fully proven to overflow frequently from eighteen inches to twelve feet, and that no one would think of cultivating it, unless it were protected by levees from inundation. Creed Taylor, Gibson, Lenox, Foster, Felts and Moore, by depositions read at the hearing, prove that they were deeply overflowed lands. A continuous levee of great length was necessary to protect them. Most of them were covered with water in 1857, and again overflowed in 1858.

No depositions were read in the court below, on behalf of the defendants, to show that the lands were not swamp and overflowed and thereby unfit for cultivation, except Jordan's, and except also those of three witnesses read before the register and receiver. As these witnesses were not shown to be dead, or beyond reach of the process of the court, it was clearly not competent to read their depositions. And the testimony of Jordan was clearly incompetent. It is claimed that he was not interested, because he had conveyed by quit claim only, and with covenants against no person save those claiming under himself. But his deed was not a quit-claim. The words used in it are of gift and grant, "grant, bargain, sell and convey." True, his warranty is only as to persons claiming under himself; but the words, "grant, bargain and sell" also import a covenant of seizin or title, broken when made, if at all, distinct from the warranty, and under which he and his heirs were and are responsible to the grantees, if the title fails in this suit. Moreover, he still stands on the record as proprietor of one undivided half of the land, not having conveyed it to any one.

The register and receiver and surveyor general were satisfied as to the character of the lands: and although it was testified that

the plantations in front also overflowed, and that a plantation liable to overflow is not thereby unfit for cultivation, this cannot prove that there are no swamp and overflowed lands in the Arkansas bottom unfit thereby for cultivation. Low and swamp lands holding rain water and overflowing to a great depth, are clearly of the character contemplated by the law; and the evidence of this is only the more conclusive, if even the front lands, almost invariably higher, and in this case certainly so, are not free from overflow unless protected by levees.

The inquiry before the register and receiver shows that those officers and the surveyor general were satisfied by proof, and so decided, that the lands were such as intended by the grant: and as no further investigation was had, it is quite plain that the patents must have issued to Jordan, not on account of any doubt on that point, but solely in obedience to the peremptory mandate of the act of March 2, 1855.

Whether it was competent to read on the hearing the depositions of Shultz and Smith, we need not consider. The testimony was sufficient without them. And, it may be added, this simple question of fact is before us here, precisely as it would be if the parties had had it tried before a jury, on an issue out of chancery, and the verdict being against them, their motion for a new trial had been overruled. Even if we thought that the weight of the testimony was against the finding, we should not disturb it unless it was palpably and glaringly wrong. If there is merely a doubt, or a preponderance of testimony one way or the other, the finding below must remain conclusive.

As to the second branch of the first inquiry, this court has already repeatedly decided that by the words of the act of 28th September, 1850, all the lands in the state which were in fact swamp and overflowed, and thereby unfit for cultivation, immediately passed to and vested in the state. The question is no longer an open one. That grave inconveniences might result to the state and individuals, and distressing conflicts of title, from the doubtful character of much of the land in the state, was a

consideration to be duly weighed by the court, in determining the meaning of the grant, and it has been duly considered. And also it was and is a consideration of no small moment, that the congress of the United States, by the act of 2d March, 1855, virtually decided that the grant was not *in presenti*, since they ordered that patents should issue to purchasers of such lands, on purchases made after the grant "any decision of the secretary of the interior, or other officer of the government of the United States to the contrary notwithstanding." So explicit a declaration of opinion by the congress invoked for the consideration of the question, careful consideration and great deliberation. Yet the congress, at the same time, admitted the validity of any sale made of such lands by the state, prior to the entry, location or purchase of the same under the laws of the United States; though such sales were ordered to be disregarded if the state should not, within ninety days, furnish a list of the lands so sold.

Whether the lands falling within the terms of the grant, had or had not vested in the state under the act, was a judicial question, which congress had not the right to take upon itself to decide; and it is but respectful to that body to suppose that it was simply the intention of the act to give purchasers their patents, so that the claimants under the state might institute proceedings in equity to establish their titles and avoid the patents. However that may be, we continue satisfied with the decisions heretofore made; and again hold that all the lands in the state which were really and in fact swamp and overflowed, and thereby unfit for cultivation, passed to and vested in the state, on the 28th of September, 1850. The case is the same as if the grant had been of all the prairie land, or all the wood land, or all the alluvial land, in the state; the difficulty of ascertainment of its character not affecting the question. The words of grant, the operative words are direct and positive: "Shall be, and the same are hereby granted to the state;" and the provision of the second section, that the secretary of the interior should make out and transmit to the governor a list and plats of the

land described, and at the request of the governor, cause a patent to issue to the state ; and that "on that patent, the fee simple to said lands shall vest in the said state," can no more be held to limit the effect of the present grant in the first section, than if, in a deed, after immediate and express conveyance of lands by some general description, it should be provided that, when the numbers should be ascertained, another deed should be made, "on which the fee simple should vest." This would make the title of the state to any of the land, depend on the request of the governor for a patent. The words of the second section must be held to be simply a definition of the *nature* of the title which the state took under the grant, and not a postponement of the period at which the title should vest.

It is quite true, that "where grants are made under descriptions so vague and indefinite, that neither the grantee nor any other can tell their location or boundaries, until the *grantee* does some act which locates and defines them, if another grant strictly defined, intervenes, the first grantee may lose what he would have been entitled to, if his own grant had been descriptive and definite." The cases decided by the supreme court of the United States, "where one had a claim, unlocated, on a large section of country, which might be located by survey at any spot not appropriated by an individual title" in which it has of course been held, that "if any other person afterwards obtained a grant by specific boundaries, within the limits wherein the prior grant was to be located, the title of the latter grantee could not be impaired by any subsequent survey of the former," are far from deciding this case. Such were *The United States vs. Forbes*, 15 *Peters*, 184; *The United States vs. King*, 3 *Howard*, 736; *Glenn vs. The United States*, 13 *Howard*, 250, *and Fremont's case*, 17 *Howard*, 558.

No doubt the land granted must in some way be severed from the public domain. If the grant were of all the lands below high water mark on the Arkansas and Red rivers, they would be sufficiently "severed from the public domain," no matter how

much trouble and difficulty it might cost to ascertain them. The definition of the lands, in this case, as well as that, is distinct and certain enough; though mistakes may be made in deciding on the question of fact. Whatever can be made certain is certain.

The position of the learned counsel, that even if the land did pass by the grant, it did not relieve the state of the necessity of getting it located and confirmed as swamp land; and that, from the time of the grant until this was done by her, the United States did not obligate themselves not to sell the lands to any one else, needs no serious refutation. The act making the grant did not require the state to do any act at all, except, through her governor, to demand the patent; and it can hardly be seriously contended, that if the secretary of the interior, in making out the lists, omitted half the lands in the state, which were really swamp and overflowed lands unfit for cultivation, the state must lose them, and would not take them under the grant. If the lands in question passed to the state by the grant, the United States no longer owned them, and of course could not sell what was no longer her own. That the state was a donee and Jordan a purchaser has no place here. A title parted with on any valid consideration is gone forever; and the reference to the distinction between executed and executory contracts is a misapplication of principle and doctrine.

The provisions of the 5th section of the act of 11th January, 1852, must be construed to be a consent on the part of the state to receive from the United States the purchase money paid to the latter, for all such of the swamp lands as the state could rightfully relinquish, and not for any which any person might obtain a right to, as against the state, before the purchase of the same by another from the United States.

This brings us to the second enquiry: which is, as to the title of Mitchell, and his right as vendee of the state or under the laws.

It is undeniable that, when he selected these lands and when

Jordan entered them, Mitchell had not completed the work he had undertaken; that none of his work had been received; and that no allowance whatever had been made him, of any amount due him on account of such work.

It is also true that the board did not confirm or act on his entries until the 8th of February, 1852: and that he stands here as if he had never obtained any certificate of entry or purchase.

It is earnestly insisted, therefore, that Mitchell fails in every respect to show that he was entitled to purchase the land, when he made the application; that he completely fails to show that he was ever, at any time, entitled to purchase them; and that an entry by him, subsequent to Jordan's location was, in any event, unavailing.

The argument is, that by the law of 6th January, 1851, he was to have a certificate issued to him, when he should have *finished* his work in accordance with his contract, and should have selected his land in payment therefor; and that Mitchell selected these lands nearly four months before the day fixed for completing his contract, and more than three months before any allowance was made him of moneys due under his contract. And it is also urged that the contract itself provided that he should be paid when the work should be finished and received.

Under the act of 11th January, 1851, Mitchell had the right, in preference to all others, to take the contract in question, for leveeing in front of these lands. Under the same act he had a right of preference or pre-emption as to these and other lands in the rear of and adjacent to his front lands. But, according to the argument, he must go on and complete the levees, before he could select any of the rear lands, and in the mean time Jordan, or any other person, might purchase these lands as swamp lands, from the state, or buy them of the United States, and so defeat his pre-emption right altogether. That would make the right truly "a visionary and unsubstantial thing." Either he could make the selection at any time, as the work progressed, and so prevent any sale of the same lands to others, or he could require

the commissioners not to sell *any* of the rear lands, which he might have a right to take in payment, to other persons. If his work did not amount to enough to pay for *all* the rear and adjacent lands, and he made no selection in time, a grant of a specific tract within the same boundaries, a sale of it by the state, *might* give title to that tract against him. It was therefore wise, prudent and fair to others, to select at an early day, the lands to which he meant to assert his right to a pre-emption. The law of January 6th, 1851, did not say that he should not *select* his land until after he had finished his work, but only that when he had done both he should furnish the numbers of the land to the commissioners, and receive from them a certificate.

As contractors often agreed to build several miles of levee, and could only carry on the work by receiving payment in land or scrip as the work progressed, the commissioners wisely provided for paying them when they completed 5,000 cubic yards, in accordance with their contracts, and fully secured, and approved by the division commissioner.

We think that it was entirely proper for Mitchell to indicate these lands to the division commissioner, five months after he commenced the work, and that his letter to Taylor, the commissioner, was a sufficient selection. He had a pre-emption right to the lands, inchoate and to be complete when he should finish the work; he had a right to receive his payment in lands; and when he had finished the work, if he had selected the lands and furnished the numbers to the commissioners, his right to the land was complete, whether he ever obtained a certificate or not. He had, in such case, done all that the law required him to do; and even if the commissioners refused him his certificate, that would not affect his right nor defeat his title.

No matter at what date he selected the lands, if he finished the work, in whole or in part, and the commissioners approved of and received it, and the amount due for it were enough to pay for the lands, they became his; and his title, if necessary, as against any intervening purchaser or claimant would relate to the

11th of January, 1851, on which day the right of preference in building the levee and taking these lands in payment vested.

And it is quite clear that, having the right of pre-emption of the land, and having taken the contract to build the levee, and commenced the work, he could not be ousted of his right of pre-emption by a purchase made by any other person, even from the state; though he did not select the lands until after such purchase. His right of pre-emption was in *all* the lands in rear of and adjacent to the front land, by right lines. Much less could any one deprive him of his right of pre-emption by purchasing the land from the United States, since they were not the owners of it.

The letter of the 12th of November, was a sufficient selection of the lands. No form is prescribed by law, or by any ordinance of the commissioners. The contractor was merely required to furnish the numbers to the commissioners, when he should have selected his lands. Of course, some sort of notification was necessary, accompanying the list, to show with certainty that he had selected these particular lands, and elected to receive them in payment for his work. The form of that was immaterial.

And the entries on the book kept by the commissioner, whether that book was large or small, and whether it was a *record* or not, are sufficient to prove the selections and applications noted in it, when the commissioner has sworn that he entered them correctly there. When he filed it in the office of the board, it became sufficient evidence to the board on which to base its certificate.

It is quite evident that the entries of Mitchell were confirmed: and as the commissioners were made by law a tribunal to pass upon all work done under contract, to approve of and accept it, or reject it, to settle the amounts due contractors and order payment, and to confirm or reject their entries and purchases of land in payment for work, from their decisions on all which matters there was no appeal, those decisions are conclusive, unless properly impeached, and the evidences, accounts, papers and the like, on which they proceeded, need not be produced to fortify their decisions, when these are relied on. That the board allowed

30

Mitchell a sufficient amount, in the aggregate, between the 7th of April, 1852 and March, 1853, for work done by him, to pay for 4,000 acres of land, and that they recognized and treated as valid his entries; and placed them on their records, and included them in the lists sent up to the auditor, proves that they had approved of and received his work and confirmed his entries, and were bound to grant him certificates of purchase. If they had not done either of these things: or if it was intended to insist that Mitchell never really built the levees, or completed his work, or that he defrauded the state, or if it was meant to rely on any other facts that might avoid the action of the board in settling the amount due to him or ratifying his entries, these matters should have been specially set up and relied on by way of defence, and would have demanded proof.

We cannot perceive that it was wrong for Taylor to decline to permit Jordan to interfere with the lands in the rear of Mitchell's front lands and levee, until Mitchell should first have indicated to what lands he intended to hold and enforce his right of pre-emption. That was simply to respect his rights.

It is testified by Kimball, the custodian of the swamp land records, that he could find in his office no estimates of the work done by Mitchell. The answer does not impeach the validity of the allowances, by any averment that no estimates or fraudulent estimates were furnished ; and it was not necessary for Mitchell to do more than prove that the allowances were made. The law presumes in favor of the commissioners, that they acted on sufficient data and evidence. The orders of allowance profess on their face to be based on estimates, and that these are no longer to be found cannot affect the validity of the allowances, when that fact appears only incidentally.

That the commissioners had the power to pay for work as it advanced towards completion we do not see any reason to doubt. The miles of levee to be made were numbered. Mitchell took several; and though many miles might be included in one contract, there is no reason for holding that the contract was in-

divisible, if the board chose to consider it otherwise. It might well be deemed a separate contract for each mile or some less length of levee. The object of the legislature was, as the act declared, "to encourage, by all just means, the progress and completion of the reclamation, by offering inducements to purchasers and contractors to take up said lands;" and if a contractor taking ten miles of levee to build, completely finished nine, and the other remained unfinished, by his death or otherwise, the commissioners were not required, by the merely directory provisions of the law to refuse to make any payment whatever for the nine miles of completed levee. The provision of the law is not mandatory nor prohibitory. It is simply, that when the contractor has finished his work, and selected his lands in payment, he shall furnish the numbers to the commisioners, and on their certificate have a deed from the governor.

And, if the selection had not been good, when made before the whole work under a contract was finished, it became good, if not withdrawn when the work *was* finished. If the contractor could not select the lands sooner, then, necessarily, no other person could intervene and take them from him by purchase. The true question in this case is, whether the state could be heard to object, on this technical ground, if Mitchell were demanding from her a deed; and she admitted that he had the pre-emption right, had done the work, and selected the land, and that the amount due him for work being sufficient, he had been charged with the price of the land and so had paid for it in 1852. Evidently the state would be estopped, after receiving payment, to object to making title in consequence of any trivial precedent informality; especially when her commissioners, invested with very ample powers, had agreed to pay all contractors as often as they should complete 5,000 cubic yards of levee. In fact she has provided for such a case, by the act of 7th January, 1857. Since it appears, both by the records in the auditor's office, and by those of the swamp land commissioners, "that the entry in fact existed," and since, in such case, the purchaser could procure from the auditor a

duplicate certificate, on his affidavit of loss, and such other evidence of it " as he can command, in the discretion of the auditor." This is the agreement of the state that she will furnish Mitchell a duplicate certificate on his demand. If he did not finish his work according to his contract, it was for the commissioners to apply the remedy or enforce the penalty, by withholding his pay, or canceling his entries. By allowance of the payments, they admitted performance on his part. They are presumed to have acted fairly, regularly and on sufficient premises, and if it is to be relied on that they were guilty of fraud or collusion, or were deceived, this must be particularly alleged and proven, or the presumption stands.

In *Walworth vs. Miles*, 23 *Ark.*, 653, Miles claimed no preemption right. He had contracted to build certain levees, and on estimates of a commissioner had been allowed for an old levee and work done, some $4,800; and in part payment he applied to purchase the lands in controversy, which application was certified by the secretary of the board to have been made. But the day after the allowances were made to Miles by the board, on protest of Walworth to the effect that the allowance for the old levee was improper, the board suspended the allowances, the application to purchase and the certificate issued for the residue of the allowance, until the question as to the sufficiency of the old levee should be determined. At the next meeting the claim for the old levee was rejected, and the entries rescinded and canceled. Meanwhile Walworth had entered the lands.

Upon this case it was held that the commissioners had not sold the lands to Miles; that they could not give certificates of application to purchase them, by Miles, when the work, in payment for which the lands were asked, had been rejected: and that when the commissioners discovered that Miles had not done the work allowed for, and was not entitled to the allowance, it was the right and duty of the commissioners to refuse to consummate the sale. The court considered the action of the commissioners to have been had in the lawful exercise of their authority, and

said: that until Miles had paid for the lands by a sufficient amount of work, he was not entitled to a certificate of purchase; and that, until he received such a certificate, he had no evidence of an entry. And it is quite true, that if he had applied to enter the lands, in payment of levee-work when nothing was due him, or not enough to pay for the land, his application would have amounted to nothing; and a subsequent entry by another, before he had paid for it, would have held the lands. For, his purchase had no prior right to rest upon or connect with. If he had had a pre-emption right to the lands, it would have been quite different. As it was, payment was the only possible inception of his title, and the court said that he could not buy or acquire a valid claim without paying for the lands; that his work once received as pay was found to be insufficient work, was therefore no payment; and therefore, his application was rightly disregarded, his scrip properly canceled. But Mitchell had a pre-emption right, and was only bound to pay for the land in one way—by doing the work undertaken by him, to a sufficient amount by a certain time, and in accordance with his contract. Whether he made known his selection of the lands sooner or later, so that he did not permit his right to lapse by abandonment, made no difference. It was only material that he should do it when or before his work was finished and received. That he paid for the land is indisputable, for the commissioners charged the price of them against the allowances made him, and the allowances were sufficient to pay for very much more land.

In *Brodie vs. Moseby*, 23 *Ark.*, 313, Moseby, like Mitchell, took a levee contract, intending to secure the rear lands by the consequent pre-emption right. He took the contract in June, 1851; applied to enter the lands in June, 1852, and had the lands marked on the plats in the office as applied for by him. In January, 1853, all levee work was required to be paid for in scrip, and in May, 1855, he renewed his claim to enter the lands, by virtue of his pre-emption right, and did do so, paying for them with scrip received for his levee work. This court held his title good,

and that his equity would have made his the better title, against any other legal title otherwise equal to his. In that case, as in this, the pre-emptor applied for the land before his work was finished. Of course an application *without* payment creates no title, but an application by a pre-emptor, *followed* by timely payment, does do so. Moseby's scrip and Mitchell's allowances were evidences of payment; because each was the evidence that so much work had been done in payment. Moseby did not *pay* for his land in the the scrip, any more than Mitchell paid for his by the allowances. The scrip was *evidence* that he *had* paid for it long before. So were the allowances. Each began to pay for his lands, as soon as he began his work. Perhaps each had fully paid for them, in fact, before he applied to enter them.

We need only refer again, in addition, to the case of *Cunningham vs. Ashley and Beebe*, 15 *Howard*, and 13 *Ark.*, 653. In that case Cunningham was entitled to a pre-emption to the quarter section in controversy, because he cultivated a portion of it in the year 1829, and was in possession on the 29th of May, 1830. He made proof of his pre-emption on the 29th of May, 1831. He then applied to enter the land, and offered to pay for it, but was not allowed to do so, in consequence of its being covered by a New Madrid claim. This was afterwards decided not to hold the land, but in the meantime Beebe entered the land with floats, and subsequently procured a patent. Every technical and formal objection possible was taken to Cunningham's claim, and it was defeated in the court of original jurisdiction and here; but it was sustained by the supreme court of the United States, which held that Cunningham's rights were paramount to those acquired under the new location, and were founded on his settlement and improvement, and the acts subsequently done in the prosecution of his claim. "Having done," the court said, "every thing which was in his power to do, the law required nothing more." The principle stated in *Lytle vs. the State of Arkansas*, "that a pre-emption right, covered by law, becomes a *legal* title, subject to be defeated only by a failure to perform the conditions annex-

ed to it," was strongly enforced in the case of *Cunningham vs. Ashley and Beebe,* and many plausible objections to the pre-emption title of the same class as those taken in this case, were with little notice overruled. It was especially urged that there was no sufficient evidence of the allowance of Cunningham's claim by the register and receiver; in other words, of their decision that his proof was sufficient to entitle him to purchase in preference to others. This proof consisted not of any *certificate* by the register and receiver, who decided upon the evidence produced, but of a *list* of the pre-emptions allowed at the land office at Batesville by those officers, found in the office and not signed by either of them, but made out by a clerk under the register's decision, and certified by a subsequent register, and a certificate of still a subsequent register, that the claim was allowed, as appeared from the papers in his office. It is evident that the court considered the claim to be quite as complete, in the absence of any certificate of allowance, as it would have been if one had been given. The list of allowed claims proved the allowance, as in this case the entries on the books of the board, and the list sent to the auditor prove Mitchell's entry and the sale to him by the commissioners.

Upon the whole case, we are clearly of opinion that when Jordan purchased of the United States, the latter had no title to the lands, they having before then vested in the state; and that Mitchell having a pre-emption right to the same under the laws of the state, having in no wise lost or abandoned his right, having selected these lands as those which he wished to take in payment for his work, and that selection having been assented to by the commissioners; and his purchase of and payment for the lands entered by them on their records and reported to the auditor, his equitable title would be good even against a purchaser from the state. It is clearly sufficient to enable him to avoid the intrusive title of Jordan or Branch. The patents vesting in Jordan no title to these lands, none can pass from Branch to Mitchell by

decree.  So much of the decree below as directs that, is surplus-
age and inoperative.  Otherwise the decree is proper, and it is
therefore affirmed.