JAMES HARRINGTON *et al.*

*v.*

MARY STEES *et al.*

1. NUNCUPATIVE WILL—*must be in last illness.* At common law, it was not essential to the validity of a nuncupative will that the testator should have been ill at all. The statute is a limitation of the common law power, and requires that it shall be made in the testator's last illness.

2. SAME—*what is last illness.* If a person, in a sickness, from which he afterwards dies, being impressed with the probability of approaching death, deliberately makes his will in conformity to the statute, it will not be rejected because he may, in fact, have had time to reduce it to writing. It is not necessary that he should have no hope of recovery.

3. SAME—*request to attest.* Under the statute, no formal request of the testator to the attesting witnesses is required. It is sufficient if his desire is clearly manifested that they bear witness to the same.

WRIT OF ERROR to the Circuit Court of Edwards county.

Mr. S. Z. LANDES, Mr. A. B. MATHEWS, and Messrs. CASEY & PATTON, for the plaintiffs in error.

Messrs. BELL & GREEN, for the defendants in error.

Mr. JUSTICE DICKEY delivered the opinion of the Court:

This was a bill in equity, by James Harrington and others, the next of kin of Henry H. Harrington, deceased, to contest the validity of a nuncupative will in favor of Mary Stees, alleged to have been made by deceased in his last sickness. The will was reduced to writing, and, together with the attest-

ing oaths, was presented to the county court and admitted to probate, and letters testamentary were issued to Robert Bell, who, with Mary Stees, was made defendant. They both filed answers, and, issues being formed, a jury was waived and the issues tried by the court. On the hearing, the circuit court found for the defendants, and dismissed the bill. The complainants bring the record here by writ of error for review.

At the first hearing here, a judgment was rendered reversing the decree of the circuit court, ordering a decree to be entered in this court.declaring the nuncupation invalid as a will. On petition of defendants in error, a rehearing was granted, and, upon further consideration, a majority of the court have arrived at a different conclusion, and are of opinion the decree of the circuit court should be affirmed.

The bill alleges that Henry H. Harrington died on the 13th of November, 1869, and that, on the 16th of the same month, an instrument of writing, purporting to be his last will, was filed in the county court, as follows:

" Be it known that we, the undersigned, were present on the 11th day of November, 1869, at the residence of Henry H. Harrington, deceased, in the city of Mount Carmel, county of Wabash, and State of Illinois, who was then in his last sickness. One of us, George W. Hughey, said to Mr. Harrington: ' Do you know what you said to me, in the afternoon, in regard to your temporal affairs?' Mr. Harrington said: ' I do.' Mr. Hughey then said to Mr. Harrington that the time was passed for having his temporal matters settled in that way (meaning that it was too late for him to get married), and that he would better make a will.

" Then the other of us, William B. Ridgway, said to Mr. Harrington that if he would tell us, as witnesses, what disposition he wanted to make of his property, we could testify to the fact in the probate court, and that it would answer as well as a written will.

" Then Mr. Harrington said: ' I intended to marry Mary Stees. This arrangement was made before I was taken sick, and we were prevented from consummating it by my sickness.

It has been my intention, all the while, that she should have everything I have, real and personal, and that is my will now.'

"Mr. Hughey then said to Mr. Harrington (referring to what Mr. Harrington had just said): 'This is your last will and testament, made in our presence, as witnesses.'

"Mr. Harrington said: 'Yes.' Mr. Harrington then paused a minute, seeming to be in a study, and then said: 'My life insurance policy (five thousand dollars) I want to go direct to her, without going through a course of administration.'

"We declare that we were present and heard the above words spoken by the said Henry H. Harrington, during his last sickness, and that, at the time of pronouncing the same, we believed him to be of sound mind and memory, and that he did, at the same time, desire us to bear witness that such words were his will, and that the speaking of said words was not procured by fraud, compulsion or other improper conduct, and that the said Henry H. Harrington departed this life on the 13th of November, 1869.

GEORGE W. HUGHEY.
WILLIAM B. RIDGWAY."

The bill charges that the supposed will was not made "in time of his last sickness," as contemplated by the statute; that the making of the same was procured by Hughey and Ridgway, in behalf of Mary Stees, by fraudulent acts, and they exercised undue influence over the mind of Harrington, so that the making thereof was not an act of his own free agency; that, at the time, Harrington was feeble in body and mind, laboring under a disease commonly called "quick consumption," so that he was incapable of making a will, and was not of sound mind and memory. These allegations are denied by defendants.

Deceased had been ill for some months before his death, and had been under the care of Dr. Lesher for two months before his death. He was able to be at his store about two weeks before he died, but for the last week or ten days was so ill that his physician visited him daily, and sometimes twice or three times a day, and during this time he was unable to rise from

1876.]       HARRINGTON *et al. v.* STEES *et al.*        53

Opinion of the Court.

his bed without assistance. On Wednesday night, November 10, 1869, he seemed much prostrated from too copious evacuations from the bowels, caused by repeated doses of oil and salts prescribed by his physician. This prostration continued until Thursday forenoon. He then rallied somewhat, but grew gradually weaker until death, which occurred Saturday morning, November 13, 1869.

On Wednesday night, sometime before midnight, Mr. Stein (a merchant, who had come to sit up with him that night) was sent by Mr. Harrington for Mr. Ridgway, Mr. Hughey and Mrs. Taylor, Harrington saying to Stein that he wished to see and speak with them. Shortly before this, Harrington, in Stein's presence, said to Mary Stees, when speaking of his temporal affairs, that they had done much for him, and that he would pay them well for it. To which Mary Stees replied: "Harry, attend to your spiritual matters, and let your temporal matters go." Harrington then said that was right; he would like to have everything in order, or something to that effect. Harrington told Mary Stees that he wanted Ridgway, Hughey and Mrs. Taylor sent for, saying he would like to have them sing and pray with him, and he wished to talk to them, anyway. After their arrival, a prayer meeting was held in the room of the invalid, Mr. Ridgway, Mr. Hughey, Mrs. Taylor, Mary Stees and her brother, R. K. Stees, being present. After these religious exercises, Mrs. Taylor, Mary Stees and R. K. Stees retired into an adjoining room, and Mr. Hughey and Mr. Ridgway were left alone at Harrington's bedside, and soon after this the conversation occurred which is set up as a will.

It is contended, first, that this will was not made "in the time of the last sickness" of deceased, in the sense in which the words are used in the statute. It is strenuously insisted that such a will, to be valid, must have been made *in extremis,* or when the testator is overtaken by sudden and violent sickness, and has not time or opportunity to make a written will. This rule was laid down by Chancellor KENT in the case of *Prince* v. *Hazelton,* 20 Johns. 501. That case was decided by a mere

majority of the court, and Mr. Justice WOODWORTH dissented, in a very elaborate opinion. This question received a very able and critical review in the case of *Johnson* v. *Glasscock et al.* 2 Ala. (N. S.) 242, where the case of *Prince* v. *Hazelton* and the authorities relied upon by Chancellor KENT are very fully considered.   In the latter case, the court deduce the following rule:   " If a person, in the sickness of which he subsequently dies, *impressed with the probability of approaching death,* deliberately makes his will in conformity to the statute, we do not feel authorized to say that it will be invalid because, in point of fact, he had time and opportunity to reduce it to writing."

This rule seems to go as far as the statute permits the courts to go.   At common law, it was not essential to the validity of a nuncupative will that the testator should have been ill at all. The statute is, in this regard, a limitation of the common law powers.   The words, " in the time of the last sickness," had no technical signification at the time of the passage of the statute.   These words must be taken in their ordinary signification.   The courts have no power to take from or add to the statute.   It is their duty to carry out the will of the legislature as found in the words of the statute, and the necessary and reasonable implications arising from these words.   The statute requires it to be proven that the will was made " in the last sickness."   It is a reasonable and necessary implication that it must also appear that the testator, at the time of making the will, supposed that his then sickness would prove his last sickness—in other words, that he should be impressed with the probability that he would never recover.

Tested by this rule, it seems plain that this will was made " in the time of the last sickness," within the meaning of these words as used in the statute.

Dr. Lesher, in speaking of the mental characteristics of the deceased, as observed by him, mentioned his " feeling of resignation to his probable dissolution."   The mere fact that he sent out in the night time for his friends and members of his church to pray with him, strongly tends to show that he was

impressed with the probability of approaching death.   Persons, having no impression that they are probably approaching the end of life, do not usually send out in the night time for the clergy and others to hold religious services.   His conversation with Mary Stees, in the presence of Mr. Stein, just before he sent out for his neighbors, necessarily implies the idea of the probable approach of death.   He is telling her that they had done much for him, and that he would pay them well for it, when she interposes, saying: "Harry, attend to your spiritual matters, and let your temporal matters go."   He replies: "That is right; I would like everything in order." What does all this mean, if it does not necessarily imply the idea that it was probable that he would not recover?

Again, when the Reverend Mr. Hughey suggested that it was too late to adjust his temporal matters in the manner he had intended, and Mr. Ridgway suggested that his temporal matters might be adjusted by an oral will, instead of replying that he had no idea that death was approaching, or saying that there was time enough left, he accepts the suggestion, and deliberately and distinctly declared what was then his will, and particularly expresses his wish that he wanted his life insurance to go direct to Mary Stees, without going through a *course of administration.*   A "course of administration" comes only after death.   Men do not usually talk and act thus unless they are impressed with the probability of approaching death.   It is plain that he was then and there so impressed. It is not necessary that the testator should have been without hope of recovery.   It is an adage, "So long as there is life there is hope."   There may well be hope while the mind is impressed with the probability of death.

There is nothing in the record tending, in any degree, to repel this idea, except the impression of Mr. Ridgway.   He gives the grounds of his impressions, and, on examination, it is apparent that his inferences had no foundation in fact.

It is next insisted, that the making of the will was procured by improper and undue influence of others.   The proofs nowhere develop anything tending to support this charge.

Henry H. Harrington, at the time of his death, was a merchant, living in the city of Mount Carmel, and for near three years had been and then was doing business with Thomas J. Shannon and Charles H. Russell, his partners. He left him surviving a father, three sisters and two brothers, but neither wife nor child. He had lived in Mount Carmel about thirteen years. Some ten years before his death he was married to Elizabeth Stees. They had five children. His wife died nearly two years before his death. Four of their children died during the life of their mother, and the fifth, a son, died about six months after her death. After the death of his wife, and before the death of his last child, Harrington made a written will, giving to each of two of his sisters $1000, and to Mary Stees, the sister of his deceased wife, $2000, and the residue of his estate to his then only child, and leaving the charge of this child to Mary Stees. This child died in July, 1868.

Soon after this, Harrington destroyed this will, and in the autumn of that year he and Mary Stees were engaged to be married, and the engagement continued until his death. Some months before his death he said to his partner Shannon (in presence of several other persons), that "if he died in his right mind no one of his father's family would get one dollar of his estate."

On Thursday morning, some hours after making his will, he said to Mr. Russell, his other partner, that he had made his will to Hughey and Ridgway, as witnesses, and had given all his property to Mary Stees. At the time these declarations were made, neither Hughey, nor Ridgway, nor Mary Stees was present. He was, surely, under no improper influence at these times. In fact, there is no proof whatever that any persuasion or suggestion was ever brought to bear upon his mind, from any source whatever, tending to give his mind any direction or bias as to what disposition he should make of his property. The fact that Hughey called his attention to his temporal affairs, and suggested that it was too late to think of marriage, does not militate, in the slightest degree, against the idea of a perfect free agency on the part of Harrington.

It was but proper that his attention should be called to the probability of approaching death, and the necessity of his taking action at once if he had any arrangements he wished to make as to his temporal affairs. The persons about him seem, from the evidence, to have been none other than respectable and worthy people, nor is there any evidence of improper motives or improper conduct on the part of any of them, nor is the disposition which he did make of his property so unnatural or extraordinary as to militate, in any degree, against the idea that it was the result of his own uninfluenced line of thought.

Mary Stees had evidently been his chief support during his past afflictions. She had, no doubt, nursed with tenderness and affection by the bedside of his dying wife. After her death she had gently and kindly cared for his motherless child, until the grave had claimed its remains. He had been engaged to be married to her for about a year. She had been his close attendant in this his last illness. In fact, at the moment of making this will, Mr. Harrington himself declared: "It has been my intention all the while that she should have everything I have." This act was not the result of the thought of the moment, brought about by the influence of others. This disposition of his property seems to have been well considered by him, and determined upon long before the declaration of the will as such, and "no proof of fraud, compulsion, or other improper conduct is exhibited, which tends, in any way, to invalidate or destroy the same."

It is charged in the bill, that the witnesses were not disinterested, and that deceased was not of sound mind and memory; but the proof shows, satisfactorily, that the deceased was mentally capable, and that the witnesses were wholly disinterested.

It is insisted in argument, though not charged in the bill, that the witnesses were not, at the time, called upon by Harrington to bear witness, but that they were mere volunteers. The language of our statute seems to have been framed especially to exclude just such an objection. The statute requires

that it be shown " that he [the testator] did, at the same time, [at the time of declaring his will] desire the persons present, or some of them, to bear witness that such was his will, or words to that effect." The last phrase of this statute was evidently intended to do away with all formal objections as to the mode of manifesting a desire that the persons should be witnesses. That desire is as unequivocally made manifest by the response " yes," to the direct question put to deceased, as if he had declared his wish never so formally.

We find no just ground of complaint against the decree of the circuit court. The decree is affirmed.

*Decree affirmed.*

Mr. JUSTICE BREESE: I do not concur in this opinion. As this court said in *Morgan et al.* v. *Stevens*, 78 Ill. 287, the provisions of the statute as to nuncupative wills must receive a rigid and strict construction. Such wills are allowed only on the ground that the party being *in extremis*, had not time and opportunity to make a more deliberate will. The *animus testandi* must appear by the clearest and most incontestible proof, embodying the real testatory intentions of the declarant. I think there is a failure in these respects in this case.