G. L. GODFREY, GUARDIAN AD LITEM, ET AL. V. LILLIE A.
SMITH.

FILED MAY 3, 1905. No. 13,644.

1. **Review: PARTIES.** The rule that a motion for a new trial is indi-
visible cannot be invoked to defeat a review of a meritorious
petition in error filed by a minor defendant, whose guardian *ad
litem* has inadvertently joined her with a mere nominal defendant
who has no rights involved in the controversy.

2. **Nuncupative Will.** A formal request from the deceased to all or

some of the three or more witnesses present to bear witness that the words spoken are his will is essential to the validity of a nuncupative will.

3. **Nuncupative wills** are not favored by the courts, and must be proved in strict conformity with the statute authorizing them.

4. **Evidence.** A nuncupative will cannot be established by witnesses having an interest in the will as the only legatees.

5. **Nuncupative Will.** Where a verbal will is made in the last sickness, of which the testator dies, when such sickness has progressed to such a point that he expects death at any time, and realizes that he is liable to die therefrom at any time; and in view of such expected death, and as preparatory thereto, makes a will near to the time of his death, such will is made in the last sickness of the testator, although a sufficient time may have intervened between the making of the oral will and the death of the testator to have permitted the making of a written will.

ERROR to the district court for Kearney county: ED L. ADAMS, JUDGE. *Reversed.*

*G. L. Godfrey* and *Joseph Pinkham,* for plaintiff in error.

*T. L. Norval, Hague & Anderberry* and *J. L. McPheely, contra.*

OLDHAM, C.

Charles A. Smith, who for about 18 years prior to his death resided in, and at the time of his death was a resident of, Kearney county, Nebraska, departed this life March 4, 1903, in the city of Minden, leaving as his sole and only heirs his widow, Lillie A. Smith, and his daughter, Alta Smith, a minor of the age of seven years, and leaving an estate consisting of real estate of the value of $12,000, and personal property of the value of $1,000. Within six days after the death of Charles A. Smith, his widow, Lillie A. Smith, had reduced to writing a paper purporting to be the nuncupative will of Charles A. Smith. A petition was duly filed in the county court of Kearney county asking that this alleged will be admitted to probate. Objections to the probate of the will were filed by

Deborah A. Pinkham, mother of deceased, and Alta Smith, infant daughter of .deceased, was made a party defendant and answered by a guardian *ad litem,* admitting the death of Charles A. Smith, and that Lillie A. Smith was the wife, and defendant Alta Smith the daughter, and only heirs of deceased, and denying each and every other allegation contained in the petition. On issues thus joined there was a trial in the county court, a judgment for defendants, and probate of the will was denied. The proponent appealed from the judgment of the county court to the . district court, and on issues joined in the district court there was a trial had to a jury, which resulted in a verdict for proponent. A judgment and decree was entered on this verdict, finding that the paper offered was the genuine and valid last will and testament of deceased, and directing that it be admitted to probate and established as a will of the real and personal estate of deceased. A joint motion for a new trial was filed in the court below by the guardian *ad litem* of the minor defendant Alta Smith, and Deborah A. Pinkham, and likewise a joint petition in error has been filed by these defendants in this court.

It is urged by able counsel for the proponent that Deborah A. Pinkham, the mother of deceased, has no pecuniary interest whatever in the estate of her deceased son, and therefore could not legally institute or conduct proceedings to contest his will. This contention is well supported in authority, and, we think, cannot be successfully contravened. *McDonald v. McDonald,* 142 Ind. 55; *Brewer v. Barrett,* 58 Md. 587; *Taff v. Hosmer,* 14 Mich. 255; *Jele v. Lemberger,* 163 Ill. 338. This position is followed by invoking the rule, too well established in this court to require citations of authority, that a motion for a new trial is indivisible, and, when made jointly by two or more parties, if it cannot be allowed as to all, it must be overruled as to all. And the same rule is invoked with reference to the joint petition in error filed in this court.

The question, then, arises, can this rule be invoked for the purpose of denying a minor defendant a hearing in this

court on a meritorious petition in error, because her
guardian *ad litem* has inadvertently joined her in a motion
for a new trial and petition in error with a mere nominal
defendant who has no substantial rights involved in the
controversy? It is the general rule that a minor may not
be estopped by anything that he says or does while he is
under age, and it would certainly seem repugnant to the
principles upon which the law protects infants from civil
liability or the spoliation of their estates to deny them a
review in this court under a mere technical rule intended
to govern the actions of litigants of full age of legal ac-
countability. We are impressed with the reason of the
rule announced in *Boerum v. Schenck,* 41 N. Y. 182, that,
where the reviewing court can clearly see that an error
has occurred to the prejudice of an infant, the infant will
not be allowed to suffer thereby for any purely technical
omission. To the same effect has been the holding in
*Branch v. Mitchell,* 24 Ark. 431; *Barnard v. Barnard,* 119
Ill. 92.

The next question that confronts us is as to the suffi-
ciency of the testimony contained in the bill of exceptions
to prove the paper offered for probate was the nuncupative
will of Charles A. Smith, deceased. Certain facts con-
nected with the death and attempted distribution of the
property of Charles A. Smith are not controverted, and
these may be said to be clearly proved. One fact is that
about 10 days before his death he called on his attorney,
Honorable J. L. McPheely, and gave a memorandum from
which he desired a written will to be drafted by his coun-
sel; that for about a week before his death Charles A.
Smith had been considerably indisposed and bedfast most
of the time, and under the care of his family physician;
that on the 3d day of March, at 8:30 o'clock A. M., the
conversation relied upon to establish the alleged nuncupa-
tive will took place at the bedside of deceased in the pres-
ence of his business partner, W. C. Taylor, and his wife
and little daughter. This conversation can be best dis-
cussed by setting out somewhat *in extenso* the testimony

on this question offered by each of these witnesses. W. C. Taylor, examined by Mr. McPheely:

Q. What time in the morning were you there? A. It was after eight o'clock, because I had opened up and then went down. Q. Now, what part of the house were you in that morning as compared with the room he occupied? A. Well, when I went in I just went to the door, and he was talking to Lillie and the little girl. Q. Did you go inside the room occupied by him? A. Yes, I did, but not right away—not at first. He was talking to them. Q. Where was he when you went into the room occupied by him? A. Lying there in the bed. Q. Who was in the room at the time? A. The little girl and Lillie his wife. Q. You mean Alta, the daughter? A. Yes, sir. Q. And Lillie A. Smith, his wife? A. Yes, and I went in right away. I just waited a moment. He was talking to them. Q. What was the wife doing at the time, aside from talking? A. She was crying. Q. What part of the bed was she sitting on? A. On the foot. Q. Foot of the bed? A. Yes. Q. Where was Alta, the daughter, the little girl? A. She was right by the father. Q. What did you hear Charles A. Smith, the deceased, say at that time in regard to the condition of his health? A. Why, he said he wasn't going to live any longer. Q. What did he say as to what disposition he wanted to make of his property? A. He said he wanted the little girl to have $1,000 when she was of age, and he wanted his wife to have the rest; and then he said that he wanted her to have the rest, because it cost so much to educate and raise the child that she ought to have it that way; and they talked on that way for quite a while. Q. Was there any reference, or anything said or made, to any writing made by myself, Mr. McPheely? A. He said before I went to leave—I told him I would have to hurry and get up and fix things for dinner—"Well," he says, "now you remember it and have it as Mac has it wrote down," he says, "as Mac has it." Q. What reference did he make to yourself during the conversation, as knowing what he wanted? A. Why, he

says to me: "I want you to see it goes that way, as Mac
has it." Q. Who did you understand he meant by Mac?
A. Who? Of course, we was talking about you in our
conversation there. Q. About myself, McPheely? A. Yes,
McPheely. He said he was up there, and he told me, and
told her, too, for to have it fixed out, but he didn't.

Alta Smith, examined by Mr. McPheely:

Q. Do you remember of a talk with your father the
morning before he died, in your house? A. Yes, sir. Q.
Who was present at that time, Alta, I mean who was
there? A. Mamma and me and Will. Q. Who do you
mean by Will? A. Will Taylor. Q. Will Taylor, the
gentleman who was just on the witness stand? A. Yes,
sir. Q. Where was your father, in bed or sitting up, at
that time? A. In bed. Q. Who was he talking to? A.
Mamma and me. Q. And was Will Taylor present at the
time—was he in the room? A. He just come in. Q. What
was your mamma doing at the time, aside from talking?
A. She was crying. Q. What did your father say about
whether he would live or not? A. I don't know about
that. Q. What did he say about what he wanted done
with his property? A. He said for me to get $1,000 and
mamma to get all the rest. Q. Said something to Mr.
Taylor, or do you remember about that? A. I don't re-
member that. Q. Do you remember anything he said ex-
cept— A. Only— Q. What he wanted you to have? A.
He said for me to get $1,000. Q. And your mamma the
balance, all the rest? A. Yes.

Lillie A. Smith, examined by Mr. McPheely:

Q. What business was your husband engaged in at the
time of his death? A. Restaurant. Q. Are you ac-
quainted with William Taylor, the witness who just testi-
fied? A. Yes, he had a home with us from the time he was
nine years old, with the exception of about two years and
a half he was in Wisconsin. Q. Were you present at the
time of your husband's death? A. Yes, I was. Q. How
long had he been confined, before his death, to his bed?
A. Well, he had been in his bed, up and down, for a week,

of course, not all the time. I would get him up in the
rocking chair to ease him and change him around, but he
hadn't been arising from his bed at all. The day before,
on Monday, the second, I got him up in his rocking chair
a few minutes, a little while, that was the last time he was
out of his bed. Q. That was on Monday? A. Yes, sir.
Q. What day of the week did his death occur? A. On
Wednesday morning, about three o'clock. Q. Was any
statement made by your husband, say on Tuesday morn-
ing, in relation to his condition and his property? A. Yes,
sir. Q. Who was present at that time? A. My little
daughter Alta, and William C. Taylor. Q. That is the
witness Taylor who was on the witness stand? A. Yes,
sir. Q. What time of day was that on Tuesday morning?
A. Just before the little girl went to school; possibly
about half past eight or near that. Q. What did your
husband say in the presence of yourself, your daughter
Alta and William Taylor, in regard to his physical con-
dition? A. Well, he said he was worse than we thought
he was. He thought he was failing so, and he was worse
off than I thought, or anyone thought, or the doctor. Q.
What did he say in regard to whether or not he thought
he would live? A. He said he didn't think he would get
well. Of course, I didn't think but what he was just talk-
ing. I didn't know how bad he was. Q. What did he say
in regard to the disposition that he desired to have made
of his property in case of his death? A. He said he wanted
the little daughter to have $1,000 when she was of age, and
he wanted that I should have the balance as my own. Q.
What did he say at that time, if anything, in reference to
a memorandum I had made for him? A. Well, he said
then that Mac knew how he wanted it, after he had told
me, and he said—he looked up and saw Will Taylor in
the room—and he says, "You see, Will, that it goes as I
want it," and he said, "Mac has it as I want it." Q. What
did he say about writing it down by myself? A. He said
you had it written down as he wanted it. * * * Q.
What answer did Mr. Taylor make to him when your

husband appealed to him, or stated that? A. He walked along up the bed, and said: "You will get well, Charley, and then you can see to your business yourself." Q. What did Charley say? A. He said: "I don't think I shall: I am very sick. I am worse than you think I am." Q. What did Mr. Taylor say as to seeing that it would be carried out, what Charley requested? A. He said he would do the best he could, he would.

Cross-examination. Q. Referring to the morning of the third, when the statements were made by Mr. Smith to which you have sworn, had he taken suddenly ill, or was he worse then than he had been, to all appearance, for the week back? A. Well, I didn't think very suddenly. It just gradually came on he was getting worse all the time. Q. Why was the little girl in there? A. Because it was her custom to come in and see her papa before she went to school. Q. Had she been going to school, Mrs. Smith, all the time up to this morning? A. Why, I think she hadn't missed any days that I know of. Q. Did she go to school the morning of the third after that? A. Yes, she went to school. Q. Who had been the attending physician? A. Dr. Martin. Q. When had you first sent for Dr. Martin? A. I got medicine from Dr. Martin—he didn't consider only his nerves, I supposed. I spoke to my husband that morning, and said: "I guess I had better call the doctor." And he said: "I have medicine to last today; I don't know whether you had better or not." Then he said afterwards: "I guess I had better wait," he said, "if it is my nerves I don't think it is necessary," but he said, "I am worse than you think, or the doctor." Q. How long prior to that time was his last visit to your husband? A. I don't remember the date. Q. Had it been four or five days? A. I guess it was that long. I cannot remember the date of it. Q. When did you next call Dr. Martin? A. On the third, in the evening. Q. What time about? A. I think about six, somewhere along there. I don't know the exact time, as I remember. Q. Had he said anything about the disposition he desired to make of his property before Mr. Taylor

came in? A. No, sir. Q. Nothing at all? A. No, sir. Q. What was the first word he said as to the disposition of his property? A. Well, I think the first he said was that he had it mapped out, or Mac had it written as he wanted it I cannot recall just the exact words, anyhow it was to the same effect, he had it just as he wanted it. He wanted I should have the handling of it, and Alta should have $1,000. Q. Did he at that time state to you that he wanted Alta to have $1,000. A. Yes, sir. Q. And that you should have the balance? A. Yes, he did. Q. Did he say anything about who should be appointed executor or executrix? A. Well, I don't know. He said Mac had it as he wanted it. I don't recollect that he spoke of it. Q. That is, Mac had the memorandum of the way he wanted it? A. Yes, sir. Q. He didn't intimate to you that Mac had made a will for him? A. It would seem that way. There was something of that nature. I don't know. Q. Did you at that time understand that Mr. McPheely had drawn a will for him? A. I didn't know anything about it until he commenced. Q. At that time you had no idea, in this conversation you had with him, it was a will, did you? A. Why, no; I didn't. Q. You never heard of the term nuncupative will before? A. No, sir. Q. Who was the first one suggested that to you? A. I suppose my attorney told me. Q. Mr. McPheely, after you had told him of this conversation? A. Yes, and he wanted Will to see that it went the way he wanted it. Q. You are sure that he said at that time without reference to anything that Mr. McPheely might have said, that he wanted Alta to have $1,000 and you the balance? A. Yes, sir.

Section 128, chapter 23, Compiled Statutes, 1903 (Ann. St. 4993), provides as follows:

"No nuncupative will shall be good when the estate thereby bequeathed shall exceed the value of one hundred and fifty dollars, that is not proved by the oath of three witnesses, at least, that were present at the making thereof, nor unless it be proved that the testator, at the time of pronouncing the same, did bid the persons present, or

some of them, to bear witness that such was his will, or to that effect; nor unless such nuncupative will was made at the time of the last sickness of the deceased, and in the place of his or her habitation or dwelling, or where he or she had been resident for the space of ten days or more next before the making of such will, except when such person was unexpectedly taken sick, being from home, and died before he or she returned to the place of his or her habitation."

It will be noted that this provision of the statute requires that the will be proved by the oath of at least three witnesses who were present at the making thereof, and that it be proved that the testator, at the time, did bid the persons present, or some of them, to bear witness that such was his will, or to that effect. Under this provision of the statute it must be proved that the deceased, while uttering the words offered as a will, had not only a present testamentary intention, but also an intention to make an oral will, and that he intended that the words then uttered and no others should constitute his will. If he only gives instruction for a will that he desires to have reduced to writing, but fails to execute, the instructions cannot be sustained as a nuncupative will. 1 Underhill, Wills, sec. 174; *In re Will of Hebden,* 20 N. J. Eq. 473; *Male's Case,* 49 N. J. Eq. 266; *Porter's Appeal,* 10 Pa. St. 254; *Reese v. Hawthorn,* 10 Gratt. (Va.) 548; *Ellington v. Dillard,* 42 Ga. 361. Now which one of the witnesses to this will, from the evidence above set out, was called upon to bear witness in the presence of the others that the words then spoken were intended to be the last will and testament of Charles A. Smith? It certainly was not the minor defendant Alta Smith, for practically all she remembered of the conversation was that her father intended to give her $1,000, and let her mother have the balance. She did not remember, nor assume to remember, that he called on either Mr. Taylor or her mother to witness that any particular words were his last will, or anything to that effect. If the will offered for probate is sustained, and if it were held that

real estate may be devised by nuncupative will under our statute, the effect of this disposition of the estate of the decedent would be to practically disinherit this minor defendant, so that probably she could not be properly held an incompetent witness because of interest in the proposed will. But in view of the very tender age of this witness she would be presumptively incompetent to testify as either a subscribing witness or an attesting witness to a will in the absence of proof showing sufficient understanding to comprehend something of the nature and contents of the instrument which she was called upon to attest, and no proof of this kind is in the record. Proof of the *rogatio testium* or formal calling of witnesses to bear witness is a necessary element in this class of wills, and no matter how clear the testamentary intent may be proved, a paper offered as such will be invalid as a nuncupative will without satisfactory proof of this requisite. Page, Wills, sec. 237; *Bundrick v. Haygood,* 106 N. Car. 468; *In re Grossman's Estate,* 175 Ill. 425; *Wiley's Estate,* 187 Pa. St. 82; *Page's Will,* 23 Wis. 69; *Porter's Appeal,* 10 Pa. St. 254. While it is true that in the proof of the *rogatio testium* no particular form of words is required, and it is sufficient under the provisions of our statute if the testator, by word, sign, or token, indicate to one of the witnesses to bear testimony that the words then spoken are intended as the last will of the testator, yet such word, sign or token must have been intended by the testator as a request and must have been understood as such by the witnesses present. *Weir v. Chidester,* 63 Ill. 453; *Owens' Appeal,* 37 Wis. 68; *Bradford v. Clower,* 60 Ill. App. 55. Now, if we construe the words as spoken to witness Taylor by decedent, "I want you to see that it goes that way," as a sufficient request to bear witness to his will, proof of this request is only supported by the testimony of witness Taylor, who is disinterested, and the wife of decedent, who is the beneficiary under the will. While it is only necessary to call on one witness to bear witness, yet it must be done in the presence of the other witnesses, and such fact must be proved by their testimony.

The general rule is that a nuncupative will cannot be established by one having an interest as legatee in the will. Beach, Wills, sec. 10; *Gill's Will*, 2 Dana (Ky.), *447; *Haus v. Palmer*, 21 Pa. St. 296; *Jones v. Norton*, 10 Tex. 120. Nuncupative wills, except those of soldiers and sailors in the active military or naval service of the government, have never been looked upon with favor by the courts, and proof of such wills is required in strict conformity with the statute authorizing them. *Morgan v. Stevens*, 78 Ill. 287; *Yarnall's Will*, 4 Rawle (Pa.), 46; *Biddell v. Biddell*, 36 Md. 630; *Taylor's Appeal*, 47 Pa. St. 31; *Lemann v. Bonsall*, 1 Add. Eccl. (Eng.) 387. Section 130, chapter 23, Compiled Statutes, 1903 (Ann. St. 4995), provides as follows:

"All beneficial devises, legacies and gifts whatsoever, made or given in any will, to a subscribing witness thereto, shall be wholly void, unless there be two other competent subscribing witnesses to the same; but a new charge on the land of the devisor for the payment of debts shall not prevent his creditors from being competent witnesses to his will."

This section of the statute plainly declares the policy of preventing the proof of wills from being established by interested witnesses. While it is true that the words, "subscribing witnesses," used in this section, technically construed, would only apply to a witness to a written will, and not to the attesting witness of an oral testament, yet, if this narrow construction be given the section above quoted, it destroys the effect of the use of the words, "all beneficial devises, legacies and gifts whatsoever, made or given in any will," for there can only be, technically, a subscribing witness to a written will; but, if a construction be given this section in conformity with the manifest intention of the lawmakers, we will treat "subscribing witness" as having been used as synonymous with "attesting witness," or a witness by whose testimony a will must be established. We are cited by counsel for proponent to a well-written opinion from the supreme court of Georgia

in the case of *Smith v. Crotty,* 112 Ga. 905, 38 S. E. 110, in which it was held that under the statutes of that state the words, "subscribing witness," could only be held to apply to a witness to a written will. The statute construed in the case just cited is as follows: "If a subscribing witness is also a legatee or a devisee under the will, the witness is competent, but the legacy or devise is void." It will be noted that this statute does not apply to legacies and devises under any will, and it specifically makes the witness competent to testify, but renders the legacy void. Now, in the case at bar, it would be purely paradoxical to hold that two of the attesting witnesses, who are the legatees under the will and sole heirs at law of the deceased, might be permitted to testify, but could take no legacy under the will, for the effect of such a holding as this would be to leave the decedent intestate, and to admit to probate an alleged will that would neither bequeath nor devise any property to anyone. We are therefore compelled to conclude that neither of the legatees named in this will are competent witnesses to establish the will.

There is another question urged for consideration, and that is as to whether the proof is sufficient to establish the fact that the will offered for probate was made at the time of the last sickness of the deceased. The expression, "last sickness," or "last illness," occurs in nearly all American statutes providing for nuncupative wills, and is borrowed from the English statute, 29 Charles the Second, of which our own statute is a practical reenactment. The leading American case which construes the term, "last sickness," in statutes of wills was written by the learned Chancellor Kent in *Prince v. Hazleton,* 20 Johns. (N. Y.) 501, and it was there held, by a divided court, however, that the term, "last sickness," was equivalent to meaning *"in extremis,"* or an illness or sickness so violent that the testator had not time, nor opportunity, nor means at hand, after making his oral will, to make a written will in legal form. This decision is generally

commended by the text-writers, and has been followed in *Bellamy v. Peeler,* 96 Ga. 467; *Donald v. Unger,* 75 Miss. 294; *Reese v. Hawthorn,* 10 Gratt. (Va.) 548; *Carroll v. Bonham,* 42 N. J. Eq. 625; *In re Rutt's Estate,* 200 Pa. St. 549, 50 Atl. 171; *O'Neill v. Smith,* 33 Md. 567. A more liberal view, however, of the meaning of this phrase has found favor in recent decisions of the supreme courts of Alabama, Tennessee, Illinois and Kansas. *Johnston v. Glasscock,* 2 Ala. 218; *Nolan v. Gardner,* 7 Heisk. (Tenn.) 215; *Harrington v. Stees,* 82 Ill. 50; *Baird v. Baird,* 70 Kan. 564, 79 Pac. 163. Under the decisions last cited, it is held that, where a verbal will is made in the last sickness of which the testator dies, when such sickness has progressed to such a point that he expects death at any time, and realizes that he is liable to die therefrom at any time, and in view of such expected death and as preparatory thereto makes a will near to the time of his death, such will is made in the last sickness of the testator, although a sufficient time may have intervened between the making of the oral will and the death of the testator to have permitted the making of a written will. We are inclined to think that this rule is all that a fair interpretation of the statute requires, and that a sufficient precaution to prevent imposition and fraud on the estates of decedents is taken by the courts when strict proof is required by disinterested witnesses that the words spoken were intended as the last will of the decedent, and that the witnesses present, or some of them, were called upon to bear witness of such fact. We think that the evidence was probably sufficient to sustain the verdict of the jury on the question that the will offered for probate was made in the last sickness of the deceased.

In view of the conclusion to be reached, it is not necessary to determine the question whether real estate is a subject of devise by nuncupative will under our statute. The only question involved in this controversy at the present time, and now before us for adjudication, is whether or not the will offered in the county court shall

52

be admitted to probate as the last will and testament of the deceased; and, because of the interest of one of the attesting witnesses and the incompetency of the other, as before set out, there is not sufficient competent evidence to sustain the judgment, and we therefore recommend that the judgment of the district court be reversed and the cause remanded for further proceedings.

AMES and LETTON, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is reversed and the cause remanded for further proceedings.

REVERSED.