Sampson vs. Browning.

No. 4.—STEPHEN SAMPSON, caveator, plaintiff in error, vs. JOHN C. BROWNING, propounder, defendant in error.

[1.] No nuncupative will can be good, "unless it be proved that the testator at the time of pronouncing the same, did bid the persons present, or some of them, bear witness that such was his will, or to that effect."

[2.] A person, certain of whose words were propounded, as his nuncupative will was at the time of speaking the words, laboring under a wound of which he died in twelve hours, and was in a constant state of stupor, except when aroused from it by the interference of other persons present. *Held*, that the words were to be considered as words spoken, "*in the time of his last sickness.*"

John C. Browning propounded for probate, before the Ordinary of Thomas county, the following instrument in writing, as containing the nuncupative will of Peyton Walden, deceased, and to which Stephen Sampson, one of the heirs, entered a caveat.

STATE OF GEORGIA, County of Thomas·

We Hansell Hall, S. Samuel Adams, Samuel Williams, and Ashly Holliday, were present on the evening of the twenty-second day of April, in the year of our Lord one thousand eight hundred and fifty-four, at the house of John Walden, at whose house Peyton Walden died suddenly; a few hours pre-

vious to his death, the said Peyton Walden, being in the full and perfect possession of his mental faculties, and of sound and disposing mind, did call upon us to take notice and remember what he was about to say, and did in our presence, will and desire to dispose of all his worldly possessions in the manner and form following, to-wit :

Item 1st. He willed and desired that all of his just debts should be paid.

Item 2nd. He willed and desired that John McLean should have and receive the sum of two dollars for each acre of land owned by the said Peyton Walden in the State of Georgia, after the lapse of five years from this date, to be paid to the said John McLean, by his executor, when the said John McLean, should arrive at the age of twenty-one years, or at an earlier period, if his said executor should think the said John McLean capable of taking charge of, and managing said property.

Item 3d. It was his will and desire that Catharine McLean should have and receive the sum of one thousand dollars.

Item 4th. He willed and desired to give to Nackey Simpson, of the State of Kentucky, all his interest in the State of Kentucky, recently left by his deceased father, to be paid and turned over to the said Nackey Simpson by his executor, when the said Nackey Simpson, shall arrive at the age of twenty-one years, or shall be united in marriage.

Item 5th. He willed and desired that John Kindred Walden, should have and receive the whole of the residue of his estate, consisting of lands, negroes, horses, stock, money, bonds, notes or other property of whatsoever kind remaining, after deducting the aforesaid mentioned legacies expressed in the previous items.

Item 6th. He willed and desired, that, in case of the death of the aforesaid John Kindred Walden, before attaining or arriving at twenty-one years of age, then and in that event, that all of the property mentioned in Item 5th, shall go and vest in James Walden.

Item 7th. He willed and desired that his plantation in the county of Thomas, State of Georgia, should remain in the Walden family, and name of Walden forever.

Item 8th. He willed and desired that his executor should use all fair and honorable means, and incur all necessary expenses, to bring William Holland to a fair and legal trial.

Item 9th. Lastly : He willed and desired to constitute and appoint John Walden of the county of Thomas, and State of Georgia, his true and lawful executor, to fulfill and carry out the provisions and wishes contained in the forgoing items.

Immediately after giving expression to the foregoing wishes and desires, the said Peyton Walden died.

April 25th 1854.

NOTE—The words "after the lapse of five years from this date," in the second Item and ninth line from the bottom of first page, inserted before signing.

<div style="padding-left:3em">

Signed,    WM. HANSELL HALL, M. D.
    "      S. SAMUEL ADAMS, M. D.
    "      SAMUEL R. WILLIAMS,
    "      ASHLY HOLLIDAY.

</div>

In person appeared before me, Thomas Simmons, a Justice of the Peace in and for said county, Wm. Hansell Hall, S. Samuel Adams, Samuel R. Williams, and Ashly Holliday, who being duly sworn, say that this paper contains the last request and verbal disposition of the estate of Peyton Walden, late of said county deceased, and is just and true in all its parts.

<div style="padding-left:3em">

Signed,    WM. HANSELL HALL, M. D.
    "      S. SAMUEL ADAMS, M. D.
    "      SAMUEL R. WILLIAMS,
    "      ASHLEY HOLLIDAY.

</div>

Sworn to and subscribed before me, this April 25th, 1854.

<div style="padding-left:6em">THOMAS SIMMONS, J. P.</div>

<div style="text-align:center">IN COURT OF ORDINARY OF THOMAS COUNTY,

December Term 1856</div>

Upon the agreement of Counsel, it is ordered that the ap-

plication for probate and record of the will of Peyton Walden, deceased be transferred by appeal to the Superior Court of said county.

Signed, HENRY H. TOOKE, Ordinary.

JOHN C. BROWNING, executor of JOHN WALDEN,

vs.

STEPHEN SAMPSON, caveator.

And now at this term of the Court, comes the defendant by his attorneys, and caveats the application to probate the nuncupative will of Peyton Walden deceased, upon the following grounds to-wit :

1st. Because the said Peyton Walden, at the time of pronouncing said pretended will, did not bid the persons present or any, or either of them bear witness that such was his will or words to that effect.

2d. Because said pretended nuncupative will, was not made in the time of the last sickness of deceased, and in the house of his habitation or dwelling, or where he had been residing for the space of ten days or more, next before the making of such pretended will.

3d. Because it does not appear that said Walden was surprised, or taken sick from his own house, and died before he returned to the place of his dwelling.

4th. None of the foregoing requisites having been reduced to writing within six days after making said pretended will, therefore caveators say pretended will is void.

5th. Because said Peyton Walden at the time of making said pretended will, was not in *extremis*, but had time after pronouncing said pretended will, to have made and signed a written will.

6th. Because after making said pretended will, said Walden lived several hours.

7th. Because the said pretended will, and the words thereof, were drawn by Jno. Walden, from the said Peyton Walden, the said John Walden being interested to establish the same.

Sampson vs. Browning.

8th. Because sufficient time after the speaking the words of said pretended will, had elapsed before the death of said Walden, to have reduced the same to writing, and to have signed the same.

9th. Because said pretended will was reduced to writing before the death of said Peyton Walden, and not signed by himself or a witness; though he had ample time to do the same.

10th. Because said pretended will, seeks to convey real estate.

11th. Because said Peyton Walden, was not of sound mind and disposing memory at the time of pronouncing said pretended will.

<div align="center">

C. B. COLE,

McINTYRE & YOUNG,

*Att'y's for caveator.*

*Brief of evidence for Propounder.*
</div>

*William Hansell Hall, M. D.* sworn, says that he was present when Peyton Walden spoke the words, as taken down by witness, and the annexed will was shown him, and he recognizes it as containing what was written down by him at the ttme. It was at the house of John Walden, his brother, in Thomasville, where he was lying dangerously ill, from a wound received by him. It was eight miles from his own house. He died there about 12 o'clock at night, of the wound he had received. He could not have been removed to his own house. He was in a stupor, but when aroused he was sensible and in his right mind, and capable of doing business, and understanding what he did. He had asked witness on the day before, to notify him when he thought he was going to die, as he wished to make a disposition of his property. On the day he spoke the words witness aroused him and told him he thought he would die, and if he had any arrangments to make about his business, he had better do it. He appeared to think he was not going to die, but when wit-

ness told him his symptoms, he appeared to think as witness did, and proceeded to make the disposition of his property as set down in annexed paper. He was drowsy and had to be aroused several times. His brother, John Walden, asked him if he did not wish to dispose of his property, and this he repeated several times, as he would seem to fall asleep after speaking a short time. John Walden did not ask him how, or to whom he wished to give his property, but only what disposition he wished to make of it. This was asked of him several times by his brother; as he stated how and to whom he wished to give his property, witness took it down on a slate. Does not think Peyton Walden knew of his taking it down. He did not tell him to take it down. Witness took it down, that he might be able to remember, it was afterwards written on paper as witness took it down, and the paper exhibited, is a copy of the one taken down. This was on the 22d day of April 1854, about 12 M. and he died about 12 o'clock at night. About two hours after his speaking the words, witness went to Peyton Walden, and aroused him, and asked him what he had done with different portions of his property, and his replies corresponded with what witness had written down on the slate. He was in his proper mind and able to have made a written will and continued in his right mind for some time after. He was able to have made a written will at the time he made this nuncupative will. He was able to have done it two hours after. There was ample time and he had sufficient mind to have dictated and strength to have made his written will, two hours after he made his nuncupative will. He would go off in a stupor, but when aroused had sufficient mind to make a will. He did not bid any of the persons nor any of them to take notice that what he was saying was his will. He appeared to understand and know what he was doing. John Walden asked persons present, to remember what his brother was saying. Peyton Walden could have heard him, but he did not appear to notice it. He said nothing

about witnesses, or witnessing what he was saying. The only persons present that witness remembers, were Dr. Adams and John Walden. Witness did not intend, in the affidavit made before Thomas Simmons, on the 25th day of April 1854, to swear that Peyton Walden asked or requested the parties present, or any of them to bear witness, that what he was going to say was his will or any words to that effect, for he said nothing on the subject. Thinks Peyton Walden's estate worth fifteen thousand dollars or more. Peyton Walden seemed to understand fully at the time that he was making a will, and the witnesses that they were witnessing a will.

*Dr. Samuel Adams* sworn, says : He was present when Peyton Walden made some verbal disposition of his property. Thinks the paper produced contains this disposition. He was competent at that time to make a will, he was of sound mind. It was on the 22nd day of April, 1854, about 12 o'clock in the day, he lived until about 12 o'clock at night, and was able to have made a written will at the time of speaking the words of his nuncupative will. Dr. Hall, Samuel Williams and Ashly Holliday, were present. He said he wished to make a disposition of his property, and did make the disposition as is contained in the paper exhibited, a copy of which is here attached; he was drowsy, and had to be aroused several times. He did not ask the persons present, or any of them, to bear witness or take notice of what he was saying, or about to say. He said nothing on the subject. John Walden did though, but don't know that Peyton Walden heard him. Witness did not intend to swear in the affidavit made before Thomas Simmons, that Peyton Walden called upon them, or any of them, to take notice and remember what he was about to say, for he did not say any such thing or any thing like it. Thinks Peyton Walden's estate worth ten thousand dollars or more. There was ample time between speaking the words and his death, to have made a written will, and he had mind and

strength sufficient to have done it at any time during the afternoon. Witness mentioned the subject to Peyton Walden, soon after he made this will, and he remembered what he had done about the disposition of his property. Peyton Walden appeared to know very well that he was making a will, and the witnesses all seemed to understand that they were witnessing his will.

*Thomas Simmons* sworn, says : He swore Dr. Hall, Dr Adams, Ashley Holliday, and Samuel Williams, to the affidavit attached to the writing as containing Peyton Walden's verbal will. It was on the 25th of April 1854.

It was agreed that the testimony of the other witnesses be dispensed with, they being out of the jurisdiction of the Court, and also agreed that proof of Sampson being an heir at law be dispensed with.

The Court read to the jury, the 19th section of the statute of frauds, relating to nuncupative wills, and charged them that the propounder must prove all the requisites of that provision of the statute, before the paper offered, could be set up as a nuncupative will, and if he had failed to prove all, or any of said requisites, they should find for the caveator ; he further charged, that if the deceased was not in *extremis*, when he spoke the words, they could not be set up as a nuncupative will; that if they believed the propounder had made out his case, they could find in favor of the writing, as a will as to the personal property, but against it, as to the real estate attempted to be disposed of. To which last charge counsel for caveator excepted.

The jury returned the following verdict :

" We the jury, find that the will be sustained, except so far as concerns the real estate conveyed therein."

And counsel for caveator, moved to set aside the verdict, and for a new trial, on the ground that the verdict was against the evidence, the law, and the charge of the Court.

The Court overruled the motion, and refused to grant a new trial, and counsel for caveator excepted.

Cole and Baily for plaintiff in error,

Seward and Hansell, represented by Harris and War-ren, for defendant in error.

*By the Court.*—Benning, J. delivering the opinion.

Should the motion for a new trial have been granted ?

The plaintiff in error contends, that there were two grounds sufficient to support the motion.

1st. A want of proof to show that the "testator, at the time of pronouncing" the words propounded as his will, " did bid the persons present, or some of them, bear witness that such was his last will, or to that effect."

2nd. A want of proof to show, that "such nuncupative will " was " made in the time of the last sickness of the deceased. "

It is true that there was no evidence going to show, that the " testator " bid the persons present, or any of them to bear such witness.

Ad the statute says, "that no nuncupative will shall be good, where the estate thereby bequeathed, shall exceed the value of thirty pounds, " unless several things concur, among which is this ; that " it be proved that the testator, at the time of pronouncing the same, did bid the persons present or some of them, to bear witness that such was his last will, or to that effect." *Pr. Dig.* 917. Yet, the verdict says, in effect, that the will shall be a good nuncupative will, except as to the realty.

The verdict consequently, is contrary to the Statute. We think therefore, that the plaintiff in error is right, in the first of his two grounds.

But we cannot say, that we think he is right, in the second of those grounds. We cannot say, that we think that there was a want of evidence to show the words in question, to have been spoken, "in the time of the last sickness" of the speaker. We think that the evidence showed the words to have been spo-

ken in the time of his last sickness. What the evidence did show, in this respect, was this: that the speaker, at the time when he spoke the words, was lying mortally wounded; that he died of the wound, twelve hours after speaking the words; that his condition was that of stupor, from which he had to be aroused, to enable him to speak at all, and into which he would relapse as soon as left to himself; that when he was aroused from this stupor to make this will, he spoke some of the words of the will, and before they could be written down he relapsed again into the stupor; that this scene was repeated several times, before all the words were spoken and taken down.

Such being what the evidence showed on this point, we cannot feel any hesitation in saying, that we think that it showed the words to have been spoken, "in the time of the last sickness" of the speaker. Not to say so, would be to give a meaning, extremely restricted, and quite arbitrary, to the expression, "in the time of the last sickness," contained in the statute. *Id* 917.

<div align="right">Judgment Reversed.</div>