58  137
158s  301

## Maurice Crean v. Michael Hourigan.

1.  Wills—*There Must Be an Intention to Make.*—If there is no intention to make a will, there can be no will.  Whether an instrument is to be considered as a will or not depends upon the intention of the maker.

2.  Nuncupative Wills—*Animus Testandi.*—As to nuncupative wills

the *animus testandi* at the time of the alleged nuncupation must be shown by the clearest and most indisputable testimony, as such wills are not favored in law.

**Contest of a Nuncupative Will.**—Appeal from the Circuit Court of Alexander County; the Hon. ALONZO K. VICKERS, Judge, presiding. Heard in this court at the August term, 1894. Affirmed. Opinion filed March 23, 1895.

GREEN & GILBERT, attorneys for appellant.

LANSDEN & LEEK, attorneys for appellee.

MR. JUSTICE SAMPLE DELIVERED THE OPINION OF THE COURT.

On the 30th day of December, 1893, the nuncupative will of Margaret Hourigan, deceased, was admitted to probate in the Probate Court of Alexander County, which bequeathed her property to her brother, Maurice Crean. The deceased's husband, Michael Hourigan, appealed from the order ad-. mitting said will to probate, to the Circuit Court, where, on trial before the court, probate was refused, from which latter order this appeal is prosecuted.

The evidence shows that on the 22d day of December, 1893, Margaret Hourigan was very sick at the hospital in the city of Cairo; that in the forenoon of that day, the reverend C. J. Eschman, the priest of that parish called on her, to whom she said, "I am a goner this time, and I don't think Michael will get to see me." When asked if he could do anything for her, she replied, "If Col. Patier could be called, he knows all about my affairs;" "she would confide with me and him what she desired to do with her property." He then left the room and called Col. Patier by telephone, and both re-entered the room together. This was shortly before noon. She said to Col. Patier, "I want all my money to go to my own dear brother, Maurice Crean." "We asked her then what she had and she told us where to find her bank book. I got the book and gave it to her and she turned it over to him. * * * She didn't mention the exact amount she had." The witness was asked if she indicated or expressed

Crean v. Hourigan.

a desire that he and Col. Patier should bear witness to the fact that she intended to make a disposition of her property. On objection being sustained, this question was put:

Q. I will ask you again, what did Mrs. Hourigan do or say when you and Col. Patier entered the room together? A. "When we came to the bedside she recognized us. She told us she wanted what she had to go to her own dear brother, Maurice Crean; did nothing else; simply told us this." When asked as to her purpose, the witness replied, "If I would have to state the purpose I would have to infer it from the request she made to me to send for Col. Patier." He further states that he thinks her purpose was to have two witnesses present. He further states that when she handed the bank book to Col. Patier she said, "Take that and what he had, and give it to her brother." Mrs. Hourigan died within two hours of the above mentioned interview.

On being recalled, the witness further said that she desired to have four masses offered for the repose of her soul.

Col. Patier, who was mayor of the city, testified: "I asked her what I could do for her. She told me she was very sick and that if she died she wanted me to have her buried in Chicago, by the side of her relatives; to pay all the expenses out of the funds in my hands, and the balance to give to Maurice Crean, her beloved brother, is the language I think she used. She asked me if I would do this. I told her I would. She said she wanted four masses said for the repose of her soul. I asked her if there was anything else I could do for her. She said she thought not. I asked her whether this was her wish and her will that she wanted me to carry out, and she said it was, and asked me if I would do it. I told her I would."

Q. If you know for what purpose she sent for you, please state it to the court. A. That is a hard question for me to state what I know. I can state what I supposed she sent for me for. I learned from her, as I would express myself, that she wanted to tell me what she wanted *me* to do with

the money I had in my hands; what disposition she wanted to make of it. This was after the book had been passed to me. I had one book in my hands already for about $400 or $500. It would be altogether $800 or $900. The money I held was deposited in my name for her. The other was deposited in her name.

The real question in the case is, does the evidence show that Margaret Hourigan *intended* to dispose of her property by *will*, and evince such intent at the time by desiring the "persons present, or some of them, to bear witness that such was her *will*, or words to that effect." Chap. 148, Sec. 15 of Statutes; or does it show that she merely intended to authorize and direct Col. Patier to dispose of her property in the manner she requested? The section referred to provides : "A nuncupative will shall be good  *  *  *  if committed to writing within twenty days after the making thereof and proven  *  *  *  by two or more credible, disinterested witnesses, who were present at the speaking and publishing thereof,  *  *  *  that they were present, and heard the testator pronounce the said words." And that she did desire the persons present, or some of them, to bear witness, etc., as above quoted.

This language makes it clear that there must be an intention to make a will as such. "If there is no *animus testandi* there can be no will." Bouvier. "Whether an instrument is to be considered as a will or not depends upon the intention · of the maker." Jarman on Wills. As to nuncupative wills, it is said : "The *animus testandi*, at the time of the alleged nuncupation, must be shown by the clearest and most indisputable testimony." Note and citations to Sec. 2, Chap. 6, Vol. 1, p. 238, Jarman on Wills.

It is further said : "Nuncupative wills are not favorites of the law. It is desirable, therefore, that the *factum* of such a will should be strictly proved." This rule is rigidly adhered to in this State. Arnett et al. v. Arnett, 27 Ill. 247; Morgan v. Stevens, 78 Ill. 287.

The evidence carefully analyzed as to what Mrs. Hourigan said in regard to the disposition of her property, con-

sidered in connection with what she did not say, does not, in our judgment, within the rules of law above announced, establish a nuncupative will, but rather forces the conclusion that she merely intended a gift *causa mortis* to her brother, Maurice Crean.

The judgment is affirmed.