(No. 6232. July 19, 1935.)

MARY MURPHY CANNON, Respondent, v. CLARENCE E. SEYBOLDT and DELLA SEYBOLDT CONYERS, Appellants.

[48 Pac. (2d) 406.]

Roy L. Black and O. R. Baum, for Appellants.

Merrill & Merrill, for Respondent.

MORGAN, J.—March 1, 1933, Ferd Seyboldt, a resident of Bannock County, Idaho, died in a hospital at Milford, Kansas, where he had gone to receive medical and surgical treatment. He left surviving his son and daughter, appellants, and his stepdaughter, respondent herein. Respondent filed in the probate court of Bannock County petition for probate of a will of which the following is a copy:

"NUNCUPATIVE WILL OF FERD SEYBOLDT, DECEASED.

"KNOW ALL MEN BY THESE PRESENTS, That on the 28th day of February, 1933, one Ferd Seyboldt of Pocatello, Bannock County, State of Idaho, was a patient in the BRINKLEY HOSPITAL at Milford, Kansas; that on said date and at said time and place the said Ferd Seyboldt was of sound and disposing mind and memory and was not acting under restraint, duress, or fraud of any person whatsoever; that at said time and place and in the presence of the undersigned, Minnie T. Brinkley and Dr. C. H. Dragoo, the said Ferd Seyboldt, addressing himself to the undersigned to bear witness of his words with respect to his will and the disposition of his property, said substantially as follows:

" 'I have some property consisting of a home in Pocatello, Idaho, and some money loaned out on interest and some other property. I have a stepdaughter whose name is Mary Cannon; she lives in Idaho a little over one hundred miles from Pocatello. I love her very much. I also have a son living in Salt Lake City, Utah, and a daughter living in California who are very dear to me but I love my daughter, Mary, as much as the other two and I want her to share equally with them in my estate. I have made no written will but after my death I direct that all of my property be divided, share and share alike, between my stepdaughter and my son and daughter.'

"That the foregoing is the true effect and substance of the words spoken as we can now remember them; that they were spoken clearly and distinctly and at said time the said Ferd Seyboldt was clear in mind and intellect.

"That the said Ferd Seyboldt died at Milford, Kansas, on the 1st day of March, 1933, and that the foregoing words were reduced to writing in this form and signed and sub-·scribed by the undersigned, in the presence of each other, on this 4th day of March, 1933.

"(Mrs.) Minnie T. Brinkley
"C. H. Dragoo M. D."

WITNESS TO SIGNATURES:
"W. C. Purviance
"Carrie Whitmore."

In due time appellants filed opposition to the petition, and contest of the will if admitted to probate. Trial in the probate court resulted in an order denying the petition, and the case was appealed to the district court where it was tried *de novo.* The district judge made findings of fact and conclusions of law and entered judgment reversing the order of the probate court, decreeing that the opposition to the probate of the will be overruled, the contest be denied and the will be admitted to probate. This appeal is from the judgment.

The evidence of statements made by Seyboldt and relied on by respondent as a nuncupative will consists, alone, of testimony of Mrs. Minnie T. Brinkley and Dr. C. H. Dragoo, submitted to the trial judge in the form of depositions. Testimony of other witnesses was taken in the district court relating to statements made by Seyboldt long prior to his departure from Idaho to enter the hospital, which in no way relates to the statements relied on as a nuncupative will. We are in as good position as was the trial judge to find facts established solely by depositions, and it is our duty to examine such evidence and determine its value. (*Ainslie v. Idaho World Printing Co.,* 1 Ida. 641; *Roby v. Roby,* 10 Ida. 139, 77 Pac. 213; *Stoneburner v. Stoneburner,* 11 Ida. 603, 83 Pac. 938; *Van Camp v. Emery,*

13 Ida. 202, 89 Pac. 752; *Council Improvement Co. v. Draper*, 16 Ida. 541, 102 Pac. 7; *Spofford v. Spofford*, 18 Ida. 115, 108 Pac. 1054; *Parsons v. Wrble*, 19 Ida. 619, 115 Pac. 8; *Jackson v. Cowan*, 33 Ida. 525, 196 Pac. 216; *McKenzie v. Miller*, 35 Ida. 354, 206 Pac. 505; *Estate of Peterson*, 38 Ida. 195, 220 Pac. 1086; *Estate of Tormey*, 44 Ida. 299, 256 Pac. 535; *Pioneer Irr. Dist. v. American Ditch Assn.*, 50 Ida. 732, 1 Pac. (2d) 196; *Keyes v. Keyes*, 51 Ida. 670, 9 Pac. (2d) 804.)

Mrs. Brinkley, who owned the hospital, was head nurse and had the management of it, testified that Seyboldt came to the institution about five o'clock in the morning February 27, 1933; that after lunch he went to his room and went to sleep; that about 6:30 in the evening she saw him and he told her he couldn't get his breath; that she called Dr. Dragoo because she thought Seyboldt was dying. She testified to a conversation between Seyboldt, Dr. Dragoo and herself at about seven o'clock in the evening of February 27, and that Seyboldt made the statements, in substance, contained in the second paragraph of the will above quoted; that he made no statement as to his physical condition and died about twelve o'clock noon, March 1, 1933; that she understood the statements contained in the second paragraph of the will to be a direction for the disposition of his property after his death. She further testified to having been called on long distance telephone by one of the attorneys for respondent, and that she repeated to him the statements which had been made by Seyboldt and which were afterwards incorporated in paragraph 2 of the will.

On cross-examination she testified she did not reduce the statements of Seyboldt to writing, but told them to the attorney over the telephone; that Mr. Seyboldt did not request her to reduce his words to writing; that he made none of the statements contained in the first paragraph of the will, and that she did not state to the attorney he did. She further testified:

"Q. What did Dr. Dragoo say?

"A. He asked the address of some of his near relatives.

"Q. Up until that time, had Mr. Seyboldt said anything to either you or Dr. Dragoo about his relatives or about his property?

"A. He had not.

"Q. Then the first thing that was said by Mr. Seyboldt was in answer to a question by Dr. Dragoo?

"A. Yes, sir; he told him the address of his son in Salt Lake City.

.    .    .    .    .    .    .    .    .    .    .    .

"Q. Then what did Dr. Dragoo ask or say to Mr. Seyboldt?

"A. I asked him.

"Q. Now, just what did you ask him?

"A. I asked him if he had made a will.

"Q. And what did he answer?

"A. He said he had not.

"Q. And then what was said to him and by whom?

"A. I asked him if he had any property.

"Q. And to that question how did he reply?

"A. He said that he had property, house in Pocatello, Idaho, had money loaned out, and he had other property.

"Q. Then what did you ask?

"A. I asked him if he had any children.

"Q. You already knew he had some children, didn't you?

"A. I didn't.

"Q. You knew he had this son?

"A. He just told us about him. I didn't know anything about any other children.

"Q. Then you asked him, 'Have you any children?' and he replied what?

"A. He said he had a stepdaughter named Mary Cannon that he loved her very much, he had this son in Salt Lake City and he had a daughter in California.

"Q. Did he use the word 'Cannon'? Did Mr. Seyboldt use the word 'Cannon'?

"A. I guess he did.

"Q. Isn't it a fact he merely used the word 'Mary'?

"A. Mary. He might have. It is my recollection he used 'Mary Cannon.'

"Q. Isn't it a fact, Mrs. Brinkley, that the word 'Cannon' was put in the will by Mr. Merrill?

"A. I didn't say it was.

"Q. Have you told me all that he said?

"A. No, I haven't.

"Q. Then what did you ask or what did he say?

"A. I am going to refresh my recollection because that is correct."

After refreshing her recollection from the will the witness testified:

"Q. What else did he say then, Mrs. Brinkley?

"A. And he said he loved Mary very much and he wanted her to share equally with the other children.

"Q. And what else did he say?

"A. After his death he wanted the property divided share and share alike with these children.

"Q. And what else?

"A. That is all the statement he made. I could talk for quite a while.

"Q. What else did he say about his property or children that night?

"A. That is all he said.

"Q. Have you given us all that was said by Mr. Seyboldt that night about his children or his property?

"A. Yes, sir; that is in substance all.

.   .   .   .   .   .   .   .   .   .   .   .

"Q. Now you were present, were you not, when Doctor Dragoo was asking the questions?

"A. Doctor Dragoo was not asking questions. He asked one question about the address of the son.

"Q. And then Doctor Dragoo didn't make any other, ask any other questions?

"A. No, sir, not to my knowledge.

.   .   .   .   .   .   .   .   .   .   .   .

"Q. Mr. Seyboldt at no time asked you to convey this statement to anyone, did he?

"A. To anyone personally. No, he did not.

"Q. And he didn't ask you to convey these words to anyone?

"A. No, he just spoke them.

"Q. As I understand you, you had never known Mr. Seyboldt until the time he arrived at your hospital?

"A. No.

.    .    .    .    .    .    .    .    . .    .    .    .

"Q. Nothing was said by Mr. Seyboldt about his property until you asked him about it, was there?

"A. No, sir.

"Q. Nothing was said by Mr. Seyboldt about whether or not he had a will until you asked him about it?

"A. No, sir.

"Q. Did Mr. Seyboldt say what his daughter's name was in California?

"A. No, he didn't say.

"Q. Did Mr. Seyboldt use the words 'but after my death'?

"A. Yes, sir.

"Q. At this conversation?

"A. Yes, sir.

"Q. You are positive about this?

"A. Certainly, I am.

"Q. Did he use the words 'I direct that all my property be divided share and share alike'?

"A. In my recollection he did, that is my understanding.

"Q. Did he use the words 'I direct that all of my property be divided share and share alike between my stepdaughter and my son and daughter'?

"A. My recollection is that he made that statement.

.    .    .    .    .    .    .    .    .    .    .    .

"Q. Did Mr. Seyboldt recover sufficient after the evening that you have stated that he made these statements to you so that he could have given direction as to the preparation of a will?

"A. Yes, sir. I was not interested in the will because I thought he was going to get well, and then he could take care of his own business.

"Q. Mr. Seyboldt didn't say to you, 'I am making my will,' did he?

"A. No, sir; he did not.

"Q. Did Mr. Seyboldt say to you 'bear in mind that I am making my will'?

"A. No, he didn't say 'bear in mind.' If he had, I would have said it there.

"Q. He didn't ask you to sign any instrument then?

"A. No, sir.

"Q. He didn't ask you to bear witness that he was making his will?

"A. No, sir.

"Q. Did he say anything to you about conveying this information to anybody?

"A. No, he didn't."

On redirect examination the following occurred:

"Q. At said time and place and in the presence of Minnie T. Brinkley and Doctor Dragoo, did the said Ferd Seyboldt address himself to the said Minnie T. Brinkley and Doctor C. H. Dragoo?

"A. He did.

"Q. Did he address himself to Minnie T. Brinkley and C. H. Dragoo to bear witness of his words with respect to the will and disposition of his property substantially as stated in the indented portion?

"A. My answer is that was my interpretation, my understanding that he was giving us instructions as to how he wanted his property disposed of."

She further testified that Mr. Seyboldt was resting a little easier when she left at midnight; that she saw him next morning, February 28, and his condition was very slightly improved; that he was a "mighty sick man"; that she saw him throughout the day of the 28th practically all

the time; that he was rational and mentally alert; that she saw him and fed him his breakfast the next morning (March 1) at about 8:30 and his condition was much improved; that he did not mention anything about his property and she was either with him or near by all the time.

Dr. Dragoo appears to have been confused about the date on which the statements, relied on as a will, were made and the date of Seyboldt's death. According to his recollection the death occurred the next day after the statements were made. It is clear, when the entire record is considered, Mrs. Brinkley is correct about the dates; that the statements were made the evening of February 27, and Seyboldt died at noon, March 1. It is also clear the recitation in the will to the effect it was made February 28, is erroneous, and February 27, is the correct date. These discrepancies and mistakes are probably unimportant, other than to again bring the frailty of human recollection and resulting unreliability of oral evidence to our attention.

With respect to the conversation relied on as a will, Dr. Dragoo, who was chief surgeon at the hospital, testified:

"Q. State the circumstances of your going into the room at that time?

"A. Mrs. Brinkley had found Mr. Seyboldt in serious condition and had called me in to see him.

"Q. What was his condition when you went in?

"A. I thought at the time he was dying. He was in extreme pain and gasping for breath, talked with great difficulty.

"Q. What was his mental condition?

"A. Mental condition seemed to be very alert.

"Q. Could you understand what he was saying with ease?

"A. Positively.

"Q. Was there any conversation at that time or any statements made by Mr. Seyboldt with reference to the disposition of his property?

"A. Yes, he did.

"Q. Will you state that conversation, Doctor?

"A. Well, I found him in his extremely serious condition. I asked him if we should notify some of his relatives and he said all right, and gave me the name of his son in Salt Lake City which I took down on a piece of paper, name and address, and handed it to Mrs. Brinkley as she had said that she would have a telegram sent. After this was done, Mrs. Brinkley asked Mr. Seyboldt if he had a will, had made a will, and he stated that he had not, but he said that he had a son in Salt Lake City, a daughter in California, and a step-daughter by the name of Mary in Pocatello, Idaho; that he had some property consisting of a house and lot in Pocatello, some money in the bank and some loaned out on interest, and that if he died he wanted Mary to share equally with his two children in the disposition of that property.

"Q. State whether or not he said anything at that time about his affection for Mary?

"A. He stated that he loved Mary as much as he loved the other two children, said that she had always been kind to him and he wanted her to share equally with the others in his property.

. . . . . . . . . . . .

"Q. State whether or not, Doctor, you understood the words which Mr. Seyboldt spoke to be a direction for the disposition of his property 'after death?

"A. My impression was that Mr. Seyboldt was trying to tell Mrs. Brinkley and I what his wishes were in reference to the disposition of his property.

"Q. Do you recall anything further being said at that time, Doctor?

"A. I don't recall any other reference to his relatives or his property.

"Q. Was there anything said as to the whereabouts of his relatives?

"A. Nothing except the names he gave me when I asked him whom we should notify of his condition.

"Q. State whether or not at the time Mr. Seyboldt spoke the words to you and Mrs. Brinkley concerning which you

have testified, he was *in extremis,* or in danger of immediate death?

"A. He was.

"Q. Would you state the condition surrounding him, it would ordinarily lead an ordinary man to believe he was in danger of impending death?

"A. The general atmosphere and impression about Mr. Seyboldt were those of seriousness and impending danger, and I judge that the ordinary man would have understood that Mr. Seyboldt's condition was very serious.

"Q. State whether or not the atmosphere which you have mentioned, the circumstances surrounding the same, and that which was said, would lead one ordinarily to believe that he was about to die?

"A. It might.

. . . . . . . . . . . .

"Q. State whether or not he said that the stepdaughter was in Pocatello or some distance out of Pocatello?

"A. I understood Mr. Seyboldt to say he had a stepdaughter in Pocatello.

"Q. Did he give her other name?

"A. No, not to me.

"Q. Doctor, state whether or not the words which Mr. Seyboldt spoke to you and Mrs. Brinkley concerning which you have testified, or the substance thereof, were later reduced to writing and signed?

"A. Yes.

. . . . . . . . . . . .

"Q. Now, state, Doctor, whether or not the instrument contains the words or substance thereof, that Mr. Seyboldt spoke to you and Mrs. Brinkley, on the 28th day of February, 1933?

"A. The article contains in substance the words that Mr. Seyboldt spoke.

"Q. Which portion of the instrument Exhibit I (the will, sometimes referred to in the record as Exhibit A) constitutes the words or the substance of the words of Ferd Seyboldt given at the time heretofore mentioned?

"A'. 'I have some property consisting of a home in Pocatello, Idaho and some money loaned out on interest and some other property. I have a stepdaughter whose name is Mary Cannon; she lives in Idaho, a little over one hundred miles from Pocatello. I love her very much. I also have a son living in Salt Lake City, Utah, and a daughter living in California who are dear to me but I love my daughter Mary as much as the other two and I want her to share equally with them in my estate. I have made no written will but after my death, I direct that all of my property be divided share and share alike, between my step-daughter and my son and daughter.'

"Q. Is the statement which you have just made into the record contained in the written instrument which you signed, being Exhibit I?

"A. Yes, sir.

"Q. State whether or not that constitutes the words or the substance of the words spoken by Ferd Seyboldt on the said 28th day of February, 1933, at the Brinkley Hospital to you and Mrs. Minnie T. Brinkley?

"A. It contains in substance the words of Mr. Seyboldt, but not the actual words.

"Q. Does it contain any of his actual words, if you recall?

"A. It does."

On cross-examination Dr. Dragoo testified:

"Q. Doctor, you read into the record the part of Exhibit A,—which is now, I,—you said Mr. Seyboldt stated. Did that include this latter part 'I direct that all my property be divided'?

"A. It did.

"Q. Doctor, before lunch I asked you a question as to whether or not Mr. Seyboldt made the statement to you at the time that you have related, that 'I direct that all my property be divided share and share alike between my step-daughter and my son and daughter' and you answered he did. Did you understand the question?

"A. Not in that way.

"Q. Did Mr. Seyboldt make that statement to you?

"A. No, he didn't use those words."

.  .  .  .  .  .  .  .  .  .  .  .  .

Dr. Dragoo testified, on cross-examination, referring to the statements relied on as a will:

"Q. What was his physical condition at that time?

"A. He was *in extremis* at that time.

"Q. And who called you in?

"A. Mrs. Brinkley.

"Q. Did you address Mr. Seyboldt first or did Mr. Seyboldt address you first?

"A. In reference to what?

"Q. To his condition or to anything that day?

"A. I addressed him first in reference to his condition.

"Q. What did you say to him, Doctor?

"A. I asked him if he had any pains. I asked him how he felt, and—

"Q. Then what?

"A. I believe that was all I asked him about his condition. Then I said, 'Don't you want us to notify some of your relatives of your condition'? and he said, 'Yes, I wish you would notify some of them' and then I said, 'Who shall it be'? He said, 'I wish you would notify my son.' He said, 'I guess that is the one I want you to notify in Salt Lake City.' I asked his son's name and address. He gave it to me. I wrote it out on a prescription pad and Mrs. Brinkley spoke up and said, 'Yes, we will have a telegram sent right away.' I handed her the pad containing the name of the son and she, as I understand, had the wire sent.

"Q. Then what occurred, Doctor?

"A. Then Mrs. Brinkley asked Mr. Seyboldt if he had made a will, and he answered, 'No, I have no will. I have not made a will.'

"Q. Then did Mrs. Brinkley ask in reference to his property?

"A. Then Mrs. Brinkley says 'You have some property to dispose of in case of death'? And he said, 'Yes, I have a house and lot in Pocatello, Idaho, some money in the bank and some money loaned on interest, and I have a step-

daughter' as I recall, he said 'living in Pocatello,' but he might have said 'living near Pocatello.' Her name is Mary and I love her as much as I do my own son and daughter, and I want her to share equally with them in my estate.'

"Q. What else was said?

"A. My recollection is that was all.

"Q. Then, Doctor, you have related to us, have you, all of the conversation had between you and Mr. Seyboldt, and between Mrs. Brinkley and Mr. Seyboldt in your presence, in reference to his children and his property?

"A. As near as I can recollect, yes.

"Q. And the words that you have given us are, as near as you can recollect, the words that were used by Mr. Seyboldt?

"A. Yes, sir.

"Q. Now, did Mrs. Brinkley use the word 'dispose' or did she merely say, 'Have you any property'?

"A. My recollection is that she asked him if he had any property.

"Q. Then, Doctor, as I understand it, you have now given us as nearly as you can recollect, word for word, everything that was said on the evening in question between you and Mr. Seyboldt, and Mrs. Brinkley and Mr. Seyboldt?

"A. Yes, sir."

With respect to signing the will, Dr. Dragoo testified, on cross-examination:

"Q. Tell us what you thought you were signing?

"A. I thought I was signing substantially the words of Mr. Seyboldt.

"Q. Did you think it was an affidavit or will or what?

"A. An affidavit.

"Q. In other words, Doctor, when you signed this instrument you thought you were signing what?

"A. I thought I was signing a witnessed statement covering the statements as made by Mr. Seyboldt as near as I could recollect it.

"Q. Did you think it was an affidavit, or what?

"A. I thought it was an affidavit, is what I thought it was.

"Q. Doctor, I wish you would take petitioner's exhibit A,—which is now appellants exhibit I,—and read that part beginning, 'I have some property consisting of a home in Pocatello' and go down through the instrument and state to us whether Mr. Seyboldt stated to you all the words or sentences used in that indented portion of petitioner's exhibit A, beginning with 'I have some property.'

"A. He didn't use all of the words contained therein.

"Q. Did Mr. Seyboldt say to you, 'but after my death I direct that all of my property be divided share and share alike between my stepdaughter and my son and daughter'?

"A. He did not.

"Q. That phrase or statement I just asked you about is the clause, statement or phrase in the quoted part of the petitioner's Exhibit A, is it not?

"A. Yes.

.  .  .  .  .  .  .  .  .  .  .  .

"Q. The next morning you talked to him?

"A. Yes, sir.

"Q. Did he make any reference the next morning to his property?

"A. No, not to me.

"Q. Was he in pain the next morning?

"A. Yes.

"Q. Or was he resting easier?

"A. He was resting better than he had been the night before and looked as though he might pull out of it.

"Q. Was his physical condition such that he could have made a written will the next morning?

"A. Yes, he could have."

He testified on redirect examination:

"Q. You stated that his condition was such the next morning that he could have made a will. He wasn't able to be out of bed, was he?

"A. I didn't see him out of bed the next morning.

"Q. And he was dead within approximately four hours, wasn't he?

"A. Approximately."

(As heretofore pointed out, the Doctor was in error with respect to the date of the death. The next morning after the statement was made was February 28. Seyboldt died at noon, March 1.)

"Q. What do you mean that he was able to have made a will? That is to say, to dictate?

"A. That his mind seemed to be clear and he had the use of his faculties sufficient to have made a will.

"Q. Then, as I understand what you mean by the answer that he could have made a will, is that his mind was clear enough to have made it?

"A. Yes, sir.

"Q. You meant nothing more by that statement, did you?

"A. I think not.

"Q. Do you know whether or not he made any comment about making a will the next morning?

"A. Not to my knowledge.

"Q. When you signed the petitioner's Exhibit A, now I, state whether or not you understood you were signing the statement or substantially the statement of Mr. Seyboldt given to you and Mrs. Brinkley on the evening of which you have testified with reference to the disposition of his property?

"A. I understood that I was signing in substance the statements of Mr. Seyboldt.

.   .   .   .   .   .   .   .   .   .   .   .

"Q. And when you replied to counsel on cross-examination that you understood, you thought you were signing an affidavit, what did you mean?

"A. I meant that I thought I was signing a legal document which could be used in court as covering the statements which I believed Mr. Seyboldt to have said.

"Q. And that, Doctor, is what you did sign, did you not?

"A. That is what I thought I was signing.

"Q. Counsel on the other side, Doctor, read to you this statement from Petitioner's Exhibit A, now I, viz.: 'But after my death I direct that all my property be divided share and share alike between my stepdaughter and my

son and daughter' and asked you if he used those words, to which, I believe you answered 'no.' I will ask you whether or not he used the substance of those words?

"A. It was in substance what he said.

"Q. Reading from Petitioner's Exhibit A, now I, this statement 'I love my daughter Mary as much as the other two and I want her to share equally with them in my estate,' did he use those words?

"A. As I recall he made that statement.

"Q. Exact words?

"A. As I recall, he used those exact words.

"Q. Counsel asked you if you reduced to writing those statements. I will ask you if you signed those statements that had been reduced to writing?

"A. Yes, I signed it but they weren't made by me.

"A. I didn't keep any notes or anything. I simply signed those I thought were his words.

"Q. I will ask you if you still think they were his words or the substance thereof?

"A. I still think they were his words with the exception heretofore made by me.

"Q. And as to that exception what do you say?

"A. With that exception it is in substance what he said.

"Q. In other words, Doctor, what I want to ask you is this, whether or not you still think that the quoted portion of petitioner's Exhibit A, now I, constitutes either the actual words or the substance of his words recited to you and Mrs. Brinkley on the date heretofore mentioned?

"A. Yes.

"Q. What I want to be sure of Doctor, is this, as to whether or not you know now that the quoted portion of petitioner's Exhibit A constitute the exact words or the substance of the exact words as closely as you remember them given by Mr. Seyboldt to you and Mrs. Brinkley on the night you mention?

"A. They are his exact words with the exceptions as heretofore mentioned by me.

"Q. Now, as to that exception, to what part do you have reference, Doctor?

"A. That part, the latter portion of the paragraph which says 'after my death I direct that Mary share and share alike with my son and daughter.'

"Q. And as to that portion, state whether or not that you just recited in reality contains in substance what he said, with reference to what he said?

"A. It is in substance what he said."

On re-cross examination he testified:

"Q. Doctor, did Mr. Seyboldt use the word 'death'?

"A. Not that I heard.

"Q. Did he use the words 'share and share alike'?

"A. Not that I heard.

"Q. Did he use the words 'I direct that all my property be divided share and share alike between my stepdaughter and my son and daughter'?

"A. No, he didn't.

"Q. Doctor, as I understood you, you have heretofore and on examination stated as nearly as you could recollect, the exact words that were used by Mr. Seyboldt, is that correct?

"A. That is correct.

"Q. As I understand it now, you did repeat as nearly as you can recollect, the exact words?

"A. Yes, sir.

"Q. And when you said to counsel that in substance he used these words, that was merely your conclusion was it not?

"A. Yes, sir.

"Q. Is that right, Doctor? You were applying your interpretation to what was said when answering counsel's questions, were you not, Doctor?

"A. I was, I believe, my interpretation as to what the words mean.

"Q. That is what you think they mean?

"A. What they mean to me."

The statements made by Seyboldt to Mrs. Brinkley and Dr. Dragoo, not their inferences as to what he

meant by them, are controlling in the determination of the question as to whether they constituted his will. The interpretation of his words and the inferences to be drawn from them are duties which devolve upon the courts, not upon the witnesses. In determining whether or not these statements constitute a will, we must be governed by what Seyboldt said, not by what the witnesses understood he meant by what he said.

We have no statutory definition of nuncupative wills, nor has our legislature, specifically, fixed their limitations. Our code sections with respect to them are as follows:

Sec. 15–234. "Nuncupative wills may, at any time within six months after the testamentary words are spoken by the decedent, be admitted to probate on petition and notice as provided for the probate of written wills. The petition, in addition to the jurisdictional facts, must allege that the testamentary words, or the substance thereof, were reduced to writing within thirty days after they were spoken, which writing must accompany the petition."

Sec. 15–235. "The probate court must not receive or entertain a petition for the probate of a nuncupative will until the lapse of fourteen days from the death of the testator, nor must such petition at any time be acted on until the testamentary words are, or their substance is, reduced to writing and filed with the petition, nor until the surviving husband or wife, if any, and all other persons resident in the state, interested in the estate, are notified as hereinbefore provided."

Sec. 15–236. "Contests of the probate of nuncupative wills, and appointments of executors and administrators of the estate devised thereby must be had, conducted and made as hereinbefore provided in cases of the probate of written wills."

Idaho Territory was created by act of congress approved March 3, 1863 (12 Stat. L. 808, chap. 117). The first territorial legislature, by an act approved January 4, 1864, provided that:

"The common law of England so far as the same is not inconsistent with the provisions of the constitution and laws of the United States, the organic act and laws of this territory, be the law of the land in this territory."

Idaho Ter. Laws, First Sess., 527.

Idaho Rev. Stats., 1887, sec. 18, which was in force at the date of the adoption of the constitution, is as follows:

"The common law of England, so far as it is not repugnant to, or inconsistent with the constitution or laws of the United States, in all cases not provided for in these Revised Statutes, is the rule of decision in all the courts of this territory."

Idaho Constitution, art. XXI, sec. 2, provides:

"All laws now in force in the territory of Idaho which are not repugnant to this constitution shall remain in force until they expire by their own limitation or be altered or repealed by the legislature."

The enactment adopting the common law of England, so far as not repugnant to or inconsistent with the constitution or laws of the United States, in all cases not provided for in our statutes, as the rule of decision to be followed by the courts, has been incorporated in the various codifications of our laws and is now I. C. A., sec. 70–116.

Because of absence of a statute defining nuncupative wills we must look to the common law for the meaning of that term, as used by the legislature in providing for their admission to probate. (*Irwin v. Rogers*, 91 Wash. 284, 157 Pac. 690, L. R. A. 1916E, 1130.)

There is lack of uniformity in the decisions of the courts of the several states, which have statutes like ours adopting the common law of England as the rule of decision, with respect to the period in the history of the common law referred to therein.

It is said in Black's Law Dictionary, page 368:

"As concerns its force and authority in the United States, the phrase designates that portion of the common law of England (including such acts of parliament as were applicable) which had been adopted and was in force here at

the time of the Revolution. This, so far as it has not since been expressly abrogated, is recognized as an organic part of the jurisprudence of most of the United States.''

However, the author points out that the Supreme Court of California has held (*Martin v. Superior Court,* 176 Cal. 289, 168 Pac. 135, L. R. A. 1918B, 313), that the legislature of that state ''in its use of the phrase 'common law' had in contemplation the whole body of that jurisprudence as it stood, influenced by statute, at the time when the Code section was adopted.'' He also cites *Herrin v. Sutherland,* 74 Mont. 587, 241 Pac. 328, 42 A. L. R. 937, wherein the Supreme Court of Montana said:

''The common law of England means that body of jurisprudence as applied and modified by the courts of this country up to the time it became a rule of decision in this commonwealth; that time began with our first territorial Legislature.''

It will not be necessary, in this case, for us to decide what period in the history of the common law was contemplated by the legislature in adopting that system of jurisprudence as the rule of decision, when not in conflict with the constitution and laws of the United States and of this state, for the facts of this case are such that the will sought to be probated cannot withstand the tests of common law requirements during any period of its history. From earliest times it was necessary that, in order to make a valid nuncupative will, the testator must call upon those present, or some of them, at the time of orally declaring his will, to bear witness that it was his last will.

Alexander's Commentaries on Wills, Vol. 1, 185, sec. 163, states:

''In Bacon's Abridgment, first published in 1736, taking the definition of a nuncupative will as laid down by Perkins, whose work was published under Henry VIII, we find it to be 'by word, or without writing, which is, where a man is sick, and for fear that death or want of memory or speech, should surprise him, that he should be prevented, if he stayed the writing of his testament, desires his neighbors and friends to bear witness of his last will, and then declares

the same presently before them; and this is called a *nuncupative* or *nuncupatory* will or testament; and this being after his death proved by witnesses, and then put in writing by the ordinary, is of as great force, for any other thing, but land, as when at the first in the life of the testator it is put in writing.' Perkins also says in his work (sec. 476) that a nuncupative will is proper when the testator 'lieth languishing for fear of sudden death, dareth not to stay the writing of his testament, and, therefore, he prayeth his curate, and others, his neighbors, to bear witness to his last will, and declareth by word what his will is.' "

See, also, Schouler on Wills, Executors and Administrators, (6th Ed.) Vol. 1, p. 506, sec. 432.

If the legislature adopted, as the rule of decision with respect to nuncupative wills, the common law of England as it existed on the date of the Declaration of Independence and as affected by the statute 29 Charles II, enacted in 1677, this will would fail when tested by its requirement that "no nuncupative will shall be good where the estate to be bequeathed shall exceed the value of thirty pounds, that is not proved by the oaths of three witnesses at the least, that were present at the making thereof, and bid by the testator to bear witness that such was his will, or to that effect." (Redfield on the Law of Wills, [3d Ed.] p. 172, and note; Alexander's Commentaries on Wills, vol. 1, 188, sec. 167.)

If the legislature adopted, as the rule of decision the common law of England as it existed at the time the first territorial legislature enacted what is now I. C. A., sec. 70–116, and as the unwritten law had been modified and influenced by acts of parliament, this proposed nuncupative will would fail when tested by the provisions of the statute of wills, 1 Vict., chap. 26, of which Alexander in his Commentaries on Wills, Vol. 1, 189, sec. 168, says:

"In the year A. D. 1837, long after the independence of these United States, there was passed in England an act for the amendment of the laws with respect to wills. This statute enacted that no will should be valid unless it was in writing and executed according to the formalities pre-

scribed, this having reference to both real and personal property, but soldiers in actual military service and mariners and seamen at sea were excepted, they being allowed to dispose of their personal estates as they might have done prior to the statute.''

Seyboldt was not, at the time of uttering the words relied on as a nuncupative will, a soldier, mariner or seaman; therefore, if the common law definition of a nuncupative will, as modified by the statute of wills of 1837, prevails in Idaho and is not abrogated by, nor inconsistent with, our statutory provisions recognizing such wills and providing for their probate, (which we do not find it necessary here to decide) he was thereby prohibited from making one.

Nuncupative wills, by reason of the opportunities they offer for the perpetration of fraud, are not favorites of the law and therefore very strict proof is universally required of all facts essential to their validity. (68 C. J. 1036, sec. 826.)

The Supreme Court of Mississippi, in *Andrews v. Andrews,* 48 Miss. 220, stated the law applicable to the facts of this case, as follows:

''Nuncupative wills, though tolerated, are by no means favorites of the law. Not only must all the provisions of the statute be strictly complied with to authorize the probate of such a will, but added to this, and independent of the statute altogether, the *factum* of a nuncupative will requires to be proved by evidence more strict and stringent than that of a written one in every particular. This is requisite in consideration of the facilities with which frauds in setting up nuncupative wills are obviously attended; facilities which absolutely require to be counteracted by courts, insisting on the strictest proofs as to the *facta* of such alleged wills. Hence, the testamentary capacity of the deceased, and the *animus testandi* at the time of the alleged nuncupation, must appear, in the case of a nuncupative will, by the clearest and most indisputable evidence, and that the proof embodies the real testamentary intentions of the deceased.''

The Mississippi court further said:

"In the case at bar, the words which are sought to be established as a nuncupative will were drawn from the deceased by an interrogatory put by one of his attending physicians. A nuncupative will procured in this way may be valid, but when so made, the court must be more upon its guard against importunity, more jealous of capacity, and more strict in requiring proof of spontaneity and volition than it would be in an ordinary case. Where a nuncupative will is drawn from the decedent by interrogatories, full and clear proof of spontaneity of the *animus testandi* is indispensable."

See, also, *Bennett v. Jackson*, (Eng.) 161 Reprint, 1116; *Parsons v. Miller*, (Eng.) 161 Reprint, 1117; *Prince v. Hazelton*, 20 Johns. (N. Y.) 501, 11 Am. Dec. 307; *Smith v. Thurman*, 2 Heisk. (29 Tenn.) 110; *Tally v. Butterworth*, 10 Yerg. (18 Tenn.) 375; *Biddle v. Biddle*, 36 Md. 630; *In re Rutt's Estate*, 200 Pa. 549, 50 Atl. 171; *Crean v. Hourigan*, 58 Ill. App. 137; *Godfrey v. Smith*, 73 Neb. 756, 103 N. W. 450, 10 Ann. Cas. 1128; *In re Kelby's Will*, (D. C.) 30 Fed. Cas. 1099, No. 18,306; *Dorsey v. Sheppard*, 12 Gill & J. (Md.) 37 Am. Dec. 77; *Dockum v. Robinson*, 26 N. H. 372; *Owen's Appeal in the Matter of Prichard's Will*, 37 Wis. 68; *Seever v. Seever*, 2 Ohio. C. C. 298; *In re Male's Will*, 49 N. J. Eq. 266, 24 Atl. 370; *Broach v. Sing*, 57 Miss. 115; *Kelly v. Kelly*, 9 B. Mon. (Ky.) 553; *Baird v. Baird*, 70 Kan. 564, 79 Pac. 163, 3 Ann. Cas. 312, 68 A. L. R. 627; *Brown v. State*, 87 Wash. 44, 151 Pac. 81, Ann. Cas. 1917D, 604; *Morgan v. Stevens*, 78 Ill. 287; *Taylor's Appeal*, 47 Pa. St. 31; *Lucas v. Goff*, 33 Miss. 629; *In re Yarnall's Will*, 4 Rawle (Pa.), 46, 26 Am. Dec. 115; *In re Will of Christopher Hebden*, 20 N. J. Eq. 473; *Wiley's Estate*, 187 Pa. 82, 40 Atl. 980, 67 Am. St. 569; *Arnett v. Arnett*, 27 Ill. 247, 81 Am. Dec. 227; *Robinson v. Jones*, 167 Ga. 38, 144 S. E. 774; *Jones v. Robinson*, 169 Ga. 485, 151 S. E. 8; *Scales v. Thornton's Heirs*, 118 Ga. 93, 44 S. E. 857; *In re Grossman's Estate*, 175 Ill. 425, 51 N. E. 750, 67 Am. St. 219; *St. James' Church v. Walker*, 1 Del. Ch. 284; *Sampson v. Browning*, 22 Ga. 293; *Dawson's Appeal*, 23 Wis. 69; *Isham v. Bingham*, 126 Ill. App. 513.

In Am. & Eng. Ency. of Law, vol. 30, p. 566, it is said:

"One of the most important restrictions which the statute of frauds placed upon the making of nuncupative wills was the requirement that the testator, at the time of pronouncing the same, should bid the persons present, or some of them, to 'bear witness that such was his will or to that effect.' This calling upon persons present to bear witness, or, as it is technically known, the *rogatio testium,* is a practically uniform requirement of the various statutes relating to nuncupative wills; and the statutes are, in this regard, strictly construed, to the end that the *animus testandi,* of which the *rogatio testium* is, in truth, the evidence, may clearly and affirmatively appear. The *rogatio testium* need not be in the exact words of the statute. Words of like import are sufficient, provided they amount to a distinct and explicit request by the testator to persons present to take notice that he intends thus to make his will. But the mere fact that the words of the will are spoken in the presence and hearing of the witnesses is not enough. The testator need not call upon persons present by name to become witnesses to his will, nor is it essential that a request to bear witness should be addressed to each and every one of the witnesses. It is sufficient if some of the witnesses are expressly called upon.

"A will made by interrogatories is valid, but the court must be more strict in requiring proof of spontaneity and volition than it would be in an ordinary case. Thus, mere declarations of a testator drawn from him by questions, he not requesting any one to bear witness that such statements are his will, are not sufficient to constitute a valid nuncupative will."

Assuming, but not deciding, that the testimony of two witnesses is sufficient to establish the making of a nuncupative will in Idaho, the facts testified to by Mrs. Brinkley and Dr. Dragoo do not entitle the document here under consideration to be probated as the will of Ferd Seyboldt. The evidence fails to establish Seyboldt believed he was about to die when the conversation between him and the wit-

nesses occurred. That conversation was not of his seeking and there is nothing to indicate he would have mentioned his children, his stepdaughter or his property if he had not been asked about them. He said nothing during the conversation from which it may reasonably be inferred he intended thereby to make a will or understood he was doing so. He did not ask anyone to bear witness that what he said was his will, nor did he ask that either of the persons present relate what he said to anyone else, or take any action which would carry out any wish he may have had that his property be divided equally between his stepdaughter, his daughter and his son.

The judgment of the district court is reversed with instruction to sustain the order of the probate court denying the petition for the probate of the will. Costs are awarded to appellants.

Holden, J., concurs.

AILSHIE, J.—I concur in Mr. Justice Morgan's opinion and in view of the fact that this case has been most exhaustively briefed and argued as indicated by the foregoing opinion, I am constrained to add an observation on the subject of *who* may make a nuncupative will and of the *class and character* of property that may be disposed of by such a will under the laws of Idaho.

It seems to me that with sec. 14–301, I. C. A., declaring that ''every person over the age of eighteen years, of sound mind, may by last will dispose of all his estate, real and personal,'' and secs. 15–234, 235 and 236, I. C. A., recognizing nuncupative wills as falling under the category of ''wills,'' it must necessarily follow that under the statutes of Idaho, any person who could make a written will may make a nuncupative will and thereby dispose ''of all his estate, real and personal.''

Givens, C. J., and Budge, J., concur in the second paragraph of the special concurrence of Ailshie, J.; otherwise dissent from his special concurrence and the majority opinion of Morgan, J.